### 15772

### CARROLL ET AL. v. BEARD-LANEY, INC.

#### (35 S. E. (2d), 425)

*Messrs. Osborne, Butler & Moore,* of Spartanburg, and *Joseph R. Moss,* of York, Counsel for Appellant,

*Messrs. W. G. Finley,* of York, and *Thomas, Cain & Black,* of Columbia, Counsel for Respondents, ▮

September 10, 1945

MR. ASSOCIATE JUSTICE STUKES delivered the majority Opinion of the Court.

I respectfully dissent from the opinion of the CHIEF JUSTICE for I think the case was properly submitted to the jury and this Court should not undertake to decide it on the facts. And I do not think that the proposed decision to the contrary is required by the authority of the cited cases from this Court.

*Knight v. Laurens Motor Car Co.,* 108 S. C., 179, 93 S. E., 869, L. R. A., 1918-B, 151, involved facts quite different. There an employee of an automobile garage took a car out after business hours (he had the keys) and went on a pleasure ride solely on his own account. Likewise, *Holder v. Haynes,* 193 S. C., 176, 7 S. E. (2d), 833, 836, is distinguished by the facts. It also involved a pleasure trip of the servant undertaken on a Sunday and the question for deci-

sion, as stated by the Court, was, quoting from the opinion: "The primary * * * question is: If the evidence shows that at the time that plaintiff was injured the truck which inflicted the injury was being driven by Willie Johnson, an employee of John E. Haynes, without the knowledge, consent or permission of John E. Haynes, the owner thereof, not in the line of Johnson's duty as such employee and not in or about the business of his employer, but wholly about Johnson's personal affairs and pleasure, is the owner of the truck liable?" In order for this case to be parallel to either of those, Falconer would have had to have taken the truck exclusively for his own purposes and gone to York to fill his date, or solely on some other personal mission.

In contrast to the facts of the cited cases, the servant-tortfeasor here was sent out under the express direction of his master to deliver the cargo of gasoline at Rock Hill. It is reasonably inferable that he was sober when he started but drunk and still drinking when he attempted delivery of the gasoline, so he voluntarily embarked upon his spree when he was unquestionably on his master's business, and the disaster resulted from his drunken state. And I think it further reasonably inferable that he started from Rock Hill to Charlotte via York, but deviated from the most direct route to evade the police who were promptly summoned by the consignee of the shipment.

The case bears some similarity to *Atlanta Laundries v. Goldberg*, Ga. App., 30 S. E. (2d), 349. In that case the servant had the duty of delivering laundry in a truck to a certain address, which he did, and then went on a beer-drinking party, becoming intoxicated, but the accident happened when he appeared to be on his way back in the truck to his employer's premises, and verdict for plaintiff was sustained on appeal. The opinion of the Georgia Court of Appeals is an interesting and well-reasoned one.

The fallacy of appellant's position is, I think, that it conceives that the moment a servant does any act in violation of his master's instructions or in failure of the proper performance of his duties, he deviates from the course of his employment and the master is not liable for his torts in the performance of such acts. But that is not the law. The tort, involving liability of the master, may be against the latter's express instructions. Suppose Falconer had assaulted Mr. Kaylor when delivering the gasoline and they had words about drinking and truck driving, is it to be doubted that the master would be liable in damages? I do not think so. See on this subject 35 Am. Jur., 993, and South Carolina cases in 23 S. E. D., 660, particularly *Redding v. South Carolina R. Co.,* 3 S. C., 1, 16 Am. Rep., 681.

A valuable authority upon the point at issue is our recent decision of *Adams v. South Carolina Power Co.,* 200 S. C., 438, 21 S. E. (2d), 17, 18. There the agent of the defendant had admittedly deviated from the course of travel required by his business for the master, having gone on a political mission for his own personal purposes, but it was held that the case should have been submitted to the jury for their determination whether at the time of the automobile accident, the master was responsible for the tort. It was said in the leading opinion:

"The terms 'course of employment' and 'scope of authority,' are not susceptible of accurate definition. What acts are within the scope of employment can be determined by no fixed rule. The authority from the master is generally to be gathered from all the surrounding and attendant circumstances. In cases where the deviation is slight and not unusual the Court may, and often will, as matter of law, determine that the servant was still executing his master's business. So, too, where the deviation is very marked and unusual, as in *Holder v. Haynes,* 193 S. C., 176, 7 S. E. (2d),

833, the Court in like manner may determine that the servant was not on the master's business at all, but on his own. Cases falling between these extremities will be regarded as involving merely a question of fact, to be left to the jury. 5 Am. Jur., Section 376, page 714.

\* \* \*

"It seems to me, under the facts shown here, that the Court should not undertake to make nice distinctions and fix with precision the line that separates the act of the servant from the act of the individual where it may be inferred from the evidence that the act in question occurred at a time when the servant was engaged in the performance or furtherance of matters coming within the general scope of his employment."

The citation from 5 Am. Jur., 714 is interesting, and the most of the pertinent section is reproduced below:

"While, as stated in the preceding section, the owner of an automobile is not liable for injuries or damages caused by the negligent operation of his automobile while it is being used by an employee for his own business or pleasure, the servant must have abandoned and turned aside completely from the master's business, to engage in some purpose wholly his own, before the master ceases to be liable for his act; it is not every deviation from the direct line of his duties on the part of an employee that constitutes a turning aside from, and an abandonment of, his master's business. A slight deviation by the servant in charge of a motor vehicle, for his own purposes, when he is on business for his master, does not affect the liability of the master for an injury resulting from the negligent operation of the automobile by the servant. This rule that a slight deviation will not take the servant out of the master's business so as to relieve the latter from liability for injuries and damage caused during such deviation has been applied in a great variety of situations. The

fact that the employer may, to serve some purpose of his own, deviate a few blocks out of his way or choose a different way back, even though it is not the most direct route, does not, as a matter of law, constitute an abandonment of the master's work."

And the following is quoted from 35 Am. Jur., 991:

"Whether the extent of his departure from the scope of his employment, or the area of his service was so unreasonable as to make of his act of deviation an independent journey of his own, rather than a mere detour or one incidental to his employment, is a question of degree which depends on the facts of the case and is a matter for the determination of the jury, unless the deviation is so great, or the conduct so extreme, as to take the servant outside the scope of his employment and make his conduct a complete departure from the business of the master."

The text in 45 A. L. R., 482, upon the subject of "deviation" is as follows:

"It is not every deviation from the direct line of his duties on the part of an employee that constitutes a turning aside from and an abandonment of his master's business; nor does the master's liability cease merely because the servant is acting contrary to, or even in defiance of, express instructions from his master, but the servant must have abandoned and turned aside completely from the master's business, to engage in some purpose wholly his own, before the master ceases to be liable for his act; so that a slight deviation by the servant in charge of a motor vehicle for his own purposes, when he is on business for his master, does not affect the liability of the master for an injury resulting from the negligent operation of his automobile by the servant."

Helpful comment upon the rule and the necessity of submitting doubtful cases, such as that before us, to the jury

is found in the opinion in *Crowell v. Duncan,* 145 Va., 489, 134 S. E., 576, 579, 50 A. L. R., 1425, as follows:

"Where it is doubtful whether a servant, in injuring a third person, was acting within the scope of his authority, the doubt will be resolved against the master because he set the servant in motion, at least to the extent of requiring the question to be submitted to the jury. 39 C. J., 1284, and cases cited."

The law of the last quotation was stated *verbatim* by us in *Adams v. South Carolina Power Co., supra,* upon the cited authority of several prior decisions of this Court.

The philosophy and justice of fixing liability upon the master for torts committed by a servant who has deviated from the course of his employment, but has not wholly abandoned it, as I think are the circumstances in the instant case, are interestingly expounded in the opinion in *Kohlman v. Hyland,* 54 N. D., 710, 210 N. W., 643, 645, 50 A. L. R., 1437, in part as follows:

"We have heretofore said that the underlying philosophy of the Workmen's Compensation Act is that industry, not the individual, shall bear the risk of injury to the laborers engaged therein. *Altman v.* [North Dakota *Workmen's*] *Compensation Bureau.* 50 N. D., 215, 195 N. W., 287 [28 A. L. R., 1337.] There is always present the possibility of injury to employees, notwithstanding every conceivable precaution may be taken to guard against it. So it is when we look at the situation from the viewpoint of the public. There is an ever-present probability that third persons will suffer injury because somebody's servant is careless, disobedient, or unfaithful to his master. This is a real, not an imaginary risk, to which bear abundant witness the development of the doctrine of respondeat superior and the myriad cases where courts have been lost in the mazes of metaphysical refinement in definition between frolic and detour. This latter risk to

the public is clearly one which industry, on the analogy of the Compensation Acts, may well be required to carry, within reasonable bounds. He who employs a servant and puts under his control an automobile must know, as every one knows, that it is not improbable that he will, on occasion, depart from strict instructions. As a fact of practical experience, this is beyond dispute; and that it does result in injury to the public the growing number of cases, involving attempted distinctions between frolic and detour, clearly shows. Such a departure from the path of duty may become so great as to amount to an abandonment of the service in the minds of all reasonable men; it should then be a question of law for the court. On the other hand, there is an area, beyond and around the place within which the strict terms of the employment require the servant to remain, into which common experience with, and observation of, human nature suggest that he will, as inclination dictates, probably go, that is, a risk which properly belongs to the business, and injury to the public by the servant while within this area should ordinarily be accepted as a burden upon the industry itself. Whether the servant is within this permissible 'zone' of deviation—permissible only in the sense that he is still within his employment—depends on the facts.''

I am unable to agree that the fact that Falconer took the wrong road releases his master from the responsibility for his tortious operation of the master's dangerous vehicle. The master sent him out on the highways of South Carolina on undoubted business for the master and the latter should be held responsible, I think, for the damages inflicted by this unfortunate mixture of gasoline and whiskey, in the absence of clearer evidence that he had wholly departed from his duties. This because it cannot be said *as a matter of law*, upon the evidence in the record, that the servant had totally disengaged himself from the services of his master or deviated therefrom in such a degree that he was no longer

in the scope of his employment. He still had the most of the cargo of the master and, having failed to deliver it in Rock Hill, it was surely his duty to return it to Charlotte. Suppose he had started directly there from Rock Hill and committed the tort along that highway, could there be doubt of the master's liability? I think not. This consideration destroys appellant's theory that upon the servant's failure to deliver all the gasoline, he broke off or abandoned the service of his master and the latter is not liable for any tort committed thereafter.

And I do not think it matters that it was the stated intention of the servant to keep an engagement with a girl in York, which may have caused him to deviate from the direct route of return to the master's place of business, for he did not live to carry out such intention. So the effect of it, had it been fulfilled, need not be considered. But quotation from the opinion in our case of *Davis v. Littlefield,* 97 S. C., 171, 81 S. E., 487, 488, is appropriate:

"When a master sends his servant to town on the master's business, we know of no court that has held that, if the servant is induced to go mainly because he wants to make purchases for himself, the private purpose of the servant will relieve the master from liability for the negligence of his servant in the conduct of the master's business."

It is a tribute to the author of the opinion of this Court, from which the foregoing was taken, that years later the American Law Institute adopted the following as a part of their Restatement of the Law of Agency, Vol. 1, p. 530, 531:

"The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if

the act otherwise is within the service, as where the servant drives rapidly, partly to deliver his master's goods, but chiefly in order that he may terminate his day's work or to return the vehicle to the master's premises. So also, the act may be found to be in the service where not only the manner of acting but the act itself is done largely for the servant's purposes. *Thus, where the servant desires to make a brief detour of his own and for the purpose of expediting such trip places the employer's goods by the roadside, intending to pick them up later, the act of so placing them may be found to be within the scope of employment.*" (Emphasis added.)

As a matter of fact, death intervened and Falconer never kept his date in York, so he did not get to attend to the personal mission which he said he intended. Appellant says in its brief: "He (Falconer) was on his way to York to fill a date with a girl, a place he had not reached and a purpose he had not accomplished when the accident occurred." An intention of the servant to depart from his employment does not affect a departure. The case in this respect is similar to *Elliott-Trant Motor Corporation v. Brennan,* 161 Va., 140, 170 S. E., 601, 602, where the driver intended to deviate materially from the route of his employment, for personal purposes, but got only a short distance in deviation when the accident intervened, and the Court said:

"We are met now with the contention of the defendant's counsel that the intention or mental fixedness of purpose of Loring to make the prospective deviation is controlling of the question in hand, rather than what he actually did or had done at the time of the accident. We are urged that the legal effect of the intended deviation was an abandonment of the business of the master and an adoption of his own business which absolved the master from liability for injury

sustained by the plaintiff. If the entire contemplated deviation had actually taken place, we are not ready to say that it would have constituted such a departure from the commission which the servant was executing or such a physical deviation from the most direct route back to the company's place as would have the legal effect urged. We do no have to decide this, in our view. The contention seems not to be sustained by either reason or law."

In like manner in the consideration of this appeal I think Falconer's intended York date is not controlling and if the jury concluded that he had undertaken the fulfillment of it, they may have further reasonably found that he was in part actuated all the while by the motive of serving his employer by delivering the latter's vehicle and cargo to its terminal. The circuitous route he chose to return to Charlotte is not, in my view, conclusive of complete adbandonment of the service of the master, necessary to absolve the latter from liability. Incidentally, the worst of the highway deviation was not directly toward York, indicating that Falconer's date did not alone influence his movements.

It cannot be gainsaid that Falconer was traveling in the direction of defendant's place of business when the wreck occurred, and the jury may well have considered such in their finding that he was sufficiently in the scope of his employment that verdict should be rendered accordingly. I think the trial judge properly concluded that a jury issue was created thereabout, and that he did not err when he submitted the case to the jury. From the evidence, it seems to me that it was no more than the nature of the vehicle Falconer was driving that caused the calamity, than it was the negligent and reckless manner in which he operated it. And I do not think that the maximum extra mileage (he had some choice of routes under his master's instructions) Fal-

coner may have driven, under the evidence, and whether over roads of earth or pavement, enable this Court to properly say, as a matter of law, that he had wholly forsaken his employment or forsaken it sufficiently to absolve his master from liability for his delicts in the operation of his master's vehicle, which contained his master's cargo, on route toward his master's place of business.

I think the trial judge committed no error when he declined to set aside the verdict and said in part, as follows:

"R. L. Bradley, manager of the Charlotte Terminal of the defendant, testified that Falconer as well as all of the defendant's drivers were instructed to take the shortest, most direct and best route and that Falconer was given no specific instructions as to the route to take on the occasion in question. This witness further testified that by best route he meant the best route with reference to traffic conditions, the condition of the road, curves, hills, and not altogether the shortest route. The testimony of the witness, Haffner Morrison, offered by plaintiff in reply, makes an issue of fact for the jury to determine whether or not the route from Rock Hill to Charlotte by McConnellsville (or the cut-off on the McConnellsville Road from the Moore place to the Chester-York highway) and York, amounted to such a deviation as would be a complete departure from the business of the defendant, because this testimony, if believed, would place the truck of defendant at the time of the accident on a route back from Rock Hill to Charlotte, traveling to Charlotte. It is true that the distance from Rock Hill to Charlotte by the actual route taken by Falconer is longer than the more direct route through Fort Mill, which Falconer could have taken. The difference in the distance of the two routes is so marked that it might be contended that the route taken by Falconer placed him outside of his employment, although such a conclusion would involve additional circumstances. But it seems to the Court that when the instructions given to the driver

of the truck are considered in the light of the testimony of the witness, Morrison, the jury might have reasonably concluded that Falconer was at the time of the accident on a return route from Rock Hill to Charlotte and within the instructions given to him by the defendant. If Falconer was at the time of the accident returning to Charlotte from Rock Hill on a route within the instructions given to him by the defendant, he was at such time engaged in the business of the defendant even though he intended to attend to personal matters at York, which town he had not yet reached."

Touching the point of the intoxicated condition of the servant, Falconer, and in other respects, the case is somewhat similar in facts to *Nelson v. American-West African Line,* 86 F. (2d), 730, 731, opinion by the eminent Judge Learned Hand of the Second Circuit. The action involved the tort of the boatswain of the defendant's steamer, "West Irmo", on a voyage from New York to West Africa, and while the ship was lying in a port on the Congo River. The boatswain, who was described as a sort of foreman of the crew, went ashore and, Judge Hand said, "got roaring drunk" and returned to his ship with much disorder and violence. After chasing other crew members he went into plaintiff's quarters and found him asleep and struck him, ordering him up although it was not plaintiff's hour for duty. There was further altercation and plaintiff was injured. The trial judge held that the drunken boatswain was not acting for the master at the time of the assault, and dismissed the complaint. The able author of the opinion reversing the case for trial discussed the issue with his usual picturesque and impressive language, saying, in part, as follows:

"In truth it was at best an act of wanton tyranny to get him out of his bunk at that time, to say nothing of the violence used in effecting it. But the boatswain was blind drunk, and through his clouded mind all sorts of vague ideas may have been passing; the fact that he had made himself incom-

petent to further the ship's business was immaterial, the owner had selected him to command, whatever his defects and his addicitions. If he really meant to rouse the plaintiff and send him upon duty, if he really meant to act as boatswain and for the ship, however imbecile his conduct it was his master's.

*     *     *     *     *

"The inquiry into the tangled mazes of a drunken boatswain's mind may be beyond the powers of a jury, but it is the fact upon which the case turns, and there was enough to justify them in finding that he supposed that he was acting as boatswain and not wholly as a petty tyrant."

It is manifest that in the trial of the case in hand the Court correctly charged the jury all the applicable law for no question is raised thereabout by the very thorough counsel for appellant.

Judgment affirmed.

MESSRS. ASSOCIATE JUSTICES FISHBURNE and OXNER concur.

Mr. CHIEF JUSTICE BAKER and Mr. ASSOCIATE JUSTICE TAYLOR dissent.

Mr. CHIEF JUSTICE BAKER (dissenting):

Respondents base their right of recovery in this action solely on the acts of negligence, recklessness and willfulness of appellant's employee in the driving and operation of one of its tank trucks. In other words, all delicts relied upon for a recovery are those of the driver of the tank truck owned and used by the appellant in its business. While specification of negligence (g) in paragraph 4 of the complaint appears to allege negligence of the appellant in permitting the driving and operating of the said truck by its employee while he was in an intoxicated condition, this por-

tion of specification (g) was not relied upon by the respondents, the only testimony in the case as to the condition of the driver of the truck at the time he was entrusted with the cargo of gasoline for its delivery being furnished by the appellant, and which testimony negatived negligence thereabout.

Upon the trial of the case in the Court below and at the conclusion of the testimony, appellant moved for a direction of verdict in its behalf, both as to actual and punitive damages, on fourteen stated grounds, all of which were encompassed in its first ground and reading: "The only reasonable inference to be drawn from the evidence is, that Walter Falconer, the driver of the truck, was not in the course of his master's business at the time that the truck overturned and caused the damage complained of in this case."

This motion was refused, and the jury returned the verdict in favor of respondents as follows: For the plaintiff, Equitable Fire Insurance Company of Charleston, South Carolina, $1,000.00 actual damages; for the plaintiff, R. A. Carroll, $5,000.00 actual and $1,500.00 punitive damages.

Following the rendition of this verdict, the appellant moved for judgment *non obstante veredicto* or, in the alternative, for a new trial. This motion was likewise refused, and hence this appeal.

The damages suffered by the respondents were occasioned by the burning of the residence of the respondent Carroll and the contents thereof on Saturday evening, February 27, 1943, when a truck of appellant, driven by one, Walter Falconer, turned over and set fire to Carroll's house, on which said Equitable Fire Insurance Company has issued a policy of fire insurance for $1,000.00, which following the fire it paid and took a subrogation receipt, and was accordingly joined as a party plaintiff, and is now one of the respondents.

There is no dispute whatsoever that the loss of the respondents was caused by the negligence, willfulness and wantonness of Falconer, the driver of appellant's truck. The paramount issue in this case, and the only issue necessary to a decision thereof, is: Can any other reasonable inference be drawn from the testimony than that at the time when appellant's driver was guilty of the negligent, willful and wanton operation of appellant's truck, resulting in respondent's loss (and also resulting in the death of the driver and the destruction of the truck), appellant's employee had completely abandoned the business of appellant, while in the midst of performing it and before completing it, and gone off on a purely personal mission, which mission had not been accomplished?

There is no basis for dispute as to the pertinent facts of this case. These facts have been succinctly set forth in the appellant's brief, and disclose substantially the following:

Appellant is a corporation engaged in the transportation for hire, in tank trucks owned by it, of petroleum products belonging to certain of the major oil companies, for delivery to purchasers of the oil companies' products. Appellant does not own or acquire any of the products themselves, but simply transports them from the oil companies' terminal to such customers as the particular oil company may direct. For this service, of course, appellant receives a transportation charge from the oil company. In carrying on this business appellant has a number of these motor transport carriers, or tank trucks, for the operation of which in making such transportation, it employs truck drivers, whose sole duties are to take the tanker to the loading point, drive the truck to the point of destination, attend to the unloading of the tanker and return to appellant's terminal, obtaining the necessary signatures on the order and delivery blanks at the terminal, at the loading point and from the purchaser at the point of delivery.

One of appellant's drivers employed for this purpose was Walter Falconer. He operated from the terminal of appellant on West Morehead Street at Charlotte, North Carolina. On February 27, 1943, Falconer had been working for appellant about twenty-one days. He was an experienced truck driver. After his employment by appellant, and prior to the fatal trip of February 27, 1943, Falconer had made six trips from Charlotte to Rock Hill, delivering petroleum products in his regular employment by appellant. On the trip on February 22nd (the last Falconer made to Rock Hill prior to February 27th) he was followed by another truck and driver of appellant, down Highway 21 as far as Pineville, where Falconer turned to the right on the highway to Rock Hill, while the following truck kept straight ahead on the road to Lancaster, its destination. While employed by appellant (February 8, 1943) Falconer had made one trip to York for the purpose of delivering a load of gasoline to the Standard Oil Company at York, that being the only place he had to go on that occasion. Falconer had lived, or at least made his temporary headquarters, at York during part of the winter of 1942 (if not longer) where he was connected with Wallace Brothers Circus, which had its winter quarters in York.

Falconer had been given explicit instructions that he was not to drink on the job. He had also been instructed to get his load at the tank farm, take it to the point of destination by the shortest, most direct and best route, deliver his load and return to appellant's terminal by the same route. In connection with the route to be followed by its driver, appellant's manager of the Charlotte, North Carolina, Terminal testified that the selection of the route was to an extent left to the discretion of its experienced drivers, and that they could take into consideration the traffic, the condition of the road, and the curves and hills to be encountered. Falconer

had no other duties. He was paid by the week, straight time, and not on a mileage basis.

On Friday, February 26, 1943, appellant, through R. L. Bradley, its plant manager at the Charlotte terminal of appellant, received an order from Republic Oil Company of Atlanta for the delivery by appellant of 4,300 gallons of Housebrand gasoline from the Thrift tank farm to the Marshall Oil Company in Rock Hill. On Saturday afternoon, February 27, 1943, Mr. Bradley called Mr. Falconer into the office and instructed him to go to the Thrift terminal (which is about nine or ten miles out of Charlotte, in the opposite direction from Rock Hill) and load his tanker with the 4,300 gallons of gasoline. At that time Mr. Bradley gave Mr. Falconer the usual order form, in this case calling for 4,300 gallons of Housebrand gasoline to be delivered to Marshall Oil Company in Rock Hill, this being the entire capacity of the tank truck. Mr. Falconer at that time was sober and gave no evidence whatever of having had anything to drink. Falconer went to the Thrift terminal where he filled his tanker with the 4,300 gallons of gasoline and obtained the shipping order and bill of lading, calling for 4,300 gallons of gasoline, for delivery to Marshall Oil Company in Rock Hill. The tanks were sealed in a manner similar to the sealing of boxcars and Falconer signed the receipt for the gasoline, as described in this order form. The seals were intact and were not broken until inspected and approved by Mr. Kaylor, Manager of the Marshall Oil Company, when the truck arrived, driven by Mr. Falconer, at the Marshall Oil Company plant in Rock Hill for unloading.

No part of the load of the gasoline was to be delivered anywhere but at Marshall Oil Company and Falconer had nothing whatever to do but deliver this load of gasoline there and return to appellant's terminal in Charlotte. He had no reason, so far as the Company was concerned, for

going to York or for being in or around McConnellsville, or for being on the road from Rock Hill to McConnellsville, or from McConnellsville to York or from York to Charlotte. There was no reason for him not to deliver the entire load to Marshall Oil Company and he had not completed his duties until he did deliver it all. There was nothing requiring him to bring any part of the load back to Charlotte.

· Falconer arrived at Marshall Oil Company's plant in Rock Hill in the neighborhood of six o'clock in the afternoon, and, finding that Kaylor, the manager, was not there, he, Falconer, called Kaylor on the telephone, told him he had the load of gasoline and was in a hurry and to come unload it. Kaylor got in his automobile and came to the Marshall plant, where he found Falconer and the truck. When Kaylor arrived at the plant he asked Falconer what his hurry was and Falconer said "he had a date in York, and he wanted to go to York to see a girl." Kaylor then checked the gauges which showed that the 4,300 gallons were in the tanker, checked the seals and found them intact, broke them and helped Falconer hook up the hose that ran from the tank truck to the underground tanks of the Marshall Oil Company, and thereby started the process of unloading. Kaylor then went in the office to build up the fire, the process of unloading being one that would require from an hour to an hour and a quarter. Falconer followed Kaylor into the office and asked Kaylor if he ever drank. Kaylor told him that he didn't but if he did he wouldn't drink on the job. Kaylor asked him if he wasn't drinking, and Falconer said he was. Kaylor told him he ought not to drink on the truck but, if he were going to drink, to wait until he got back to Charlotte. Falconer replied that he had been driving a long time and knew more about driving than Kaylor did and then said that he must get outside and see about a dog he had in the truck. Falconer then went out on the platform, where he fell, got up and went to the truck where

he got in the cab, took out of the pocket of the cab a pint bottle and took a drink. While the hose was still hooked up and the gasoline being unloaded, Kaylor went to a nearby store to get a soft drink and some crackers. Someone ran up and said that Falconer had pulled off. Falconer had gotten in the truck, cranked it up and, without turning off the flow of gasoline or unhooking the hose, driven off, stretching the hose as far as it would go, unravelling the steel wire of the hose and breaking the entire hose in two. He drove out of sight with gasoline spurting out of the place on the tanker where the hose had been attached. When he drove off there had been unloaded into Marshall Oil Company's tanks only about sixteen hundred gallons of the total of 4,300 which should have been unloaded. Kaylor called the police, but, while they went in search of the truck from Rock Hill to York over the regular main route between said places which is by Tirzah, they never did see the tanker. As Falconer pulled loose from the storage tank at Marshall Oil Company he was seen by a Negro passing by who tried ineffectively to stop him. Some distance away a Mr. Russell, who was going to his home on the McConnellsville road by way of West Main Street, saw the truck swerve out of a side street into Main Street in front of him, with the gas still pouring from the back of the truck. Russell blew his horn, and after going about two hundred yards, succeeded in stopping the truck and telling him about the gas running out. As a result the driver got out of the truck, went around to the back and cut off the gas. He was then headed in the direction of the McConnellsville road, which is in the opposite direction from the road to Charlotte. Russell did not see the truck any more, but a Negro, by the name of King Sinkler, who lives on the McConnellsville road, about three miles from McConnellsville (and about seven from York), saw a tanker truck pass, going toward York, with the right front door open and something dragging behind

knocking up fire from the pavement. A little before dark the truck, driven by Falconer, and still dragging the broken and twisted end of the hose, coming into the south edge of the town of York from the direction of McConnellsville, and traveling at a high rate of speed, estimated to be fifty-five to sixty miles per hour, failed to make the turn from the Chester or McConnellsville road into Main Street of York, and turned over in the yard of the Carroll home, catching fire, buring Falconer to death and burning down Carroll's home and destroying or damaging other nearby property. A whiskey bottle, partly full, was found near the truck.

The point of the accident is where the truck was entering the Town of York, at a point where Highway No. 321, from Chester and McConnellsville to York, and Highway No. 5, from Rock Hill to York, and Main Street of the Town of York (continuation of Highways No. 5 and 321 after converging) form a Y.

It is twenty-eight miles from Charlotte to Rock Hill by the paved road, United States Highway 21, through Pineville and Fort Mill. From Rock Hill to York by the main road, paved State Highway No. 5, it is fifteen miles. From Rock Hill to McConnellsville, by surface-treated highway No. 322, it is thirteen miles, and from McConnellsville to York, on paved Highway No. 321, it is ten miles. By way of certain dirt road short cuts it was testified that the distance between Rock Hill and York by way of the McConnellsville road could be cut down to sixtten and one-quarter miles. These short cuts are not regarded of any importance for the reason that there is no proof that Falconer either knew of or took these short cuts, and further it would appear from King Sinkler's testimony that Falconer did not take these short cuts because they would have brought Falconer out on the Chester Road (No. 321) between Sinkler's home and York, in which case he would not have passed Sinkler's home, as Sinkler testified, without contradiction,

he did. From York to Charlotte by way of the paved road by Buster Boyd Bridge and the Shell palnt (Highway No. 49) it is 32 miles.

Where one is found in the possession of the property of another, apparently using it in the business of such other, he is presumed to be the agent or servant of the owner and acting within the course of his employment. However, this is only a legal presumption, and is of course rebuttable. Upon the introduction of competent and credible evidence to the contrary, such presumption is dissipated, and standing alone and unaided does not present an issue of fact against such rebuttal evidence. For these fundamental principles, the citation of authority is unnecessary.

In the comparatively recent case of *Holder v. Haynes et al.,* 193 S. C., 176, 7 S. E. (2d), 833, 838, the late Mr. Chief Justice Bonham, in writing the opinion of the Court, ably discussed the law governing this case, thus making it unnecessary for this Court to now do more than quote excerpts from said opinion. A complete summation of the apposite law is contained in the excerpts following:

"We need not look further than our own reports for authority in support of the rule as it was charged by the trial judge in the case now on appeal, to wit:

" 'If you find from the evidence that the truck driver was negligent, willful or reckless upon the occasion alleged in the complaint but that upon said occasion he was not engaged in the doing of the truck owner's business, but was driving said truck on a trip of his own, the truck owner cannot be held liable for the results of said driver's negligence.

" 'The master cannot be held liable for the negligent acts or omissions of his servants when not acting within the scope of his employment. The test as to the liability of the master is whether the servant was guilty of negligence in the doing of his master's work.'

"We hold this to be a correct statement of the law of respondeat superior.

"Nowhere has this rule of respondeat superior been more clearly considered and applied than in the case of *Knight v. Laurens Motor Car Company,* 108 S. C., 179, 93 S. E., 869, L. R. A., 1918-B, 151. The opinion of this court was delivered by Mr. Justice Gage and still stands as the law of this jurisdiction on the doctrine of respondeat superior, and it stands as a monument to the power of analysis and aptness of application of the law to the facts of the learned justice who wrote it. * * *

" 'The relationship between an owner of an automobile and one employed by him to drive it is the same as that between master and servant generally, and the liability of the owner for the negligence of the driver is to be determined by an application of the general rules of law governing the liability of a master for the negligence of his servant. It is the firmly settled rule that when a servant completely departs from his work to accomplish some purpose of his own not connected with his employment, the relation of master and servant is thereby temporarily suspended and the master is not liable for his acts during the period of such suspension.' * * *

" 'With respect to departure from employment, without consent of owner, "the general rule is that a servant in charge of his master's automobile, who, though originally bound upon a mission for his master, completely forsakes his employment and goes upon an errand exclusively his own, and while so engaged commits a tort, does not thereby render the master answerable for such tort under the rule of respondeat superior." 5 Blashfield's Cyc. of Automobile Law and Practice, Perm. Ed., § 3029.' "

Applying the foregoing established law in this State to the undisputed facts, we must reach the conclusion that there is no legal liability on the part of the appellant.

By way of recapitulation, appellant's driver was sent from Thrift tank farm situate nine or ten miles out of Charlotte, N. C., in the opposite direction from Rock Hill, S. C., with a tank truck containing 4,300 gallons of gasoline, the full capacity of the tank, to be delivered to Marshall Oil Company in Rock Hill. (At the time the appellant's driver was entrusted with this mission there was no evidence that he was drinking.) When the driver reached his destination, he informed the manager or receiving agent of Marshall Oil Company that he was in a hurry to unload the cargo as he had a "date" in York, and wanted to go there to see a girl. He was then under the influence of some alcoholic beverage, and though warned that he should not drink on the job, proceeded to take at least one other drink, the size thereof being unknown. While in the act of delivering the gasoline to the consignee thereof, and when only between 1,500 and 1,600 gallons of the 4,300 gallons of gasoline had been pumped from the tank truck to the tanks of the consignee, and while the hose from the truck to the receiving tank was still connected, the driver drove the tank truck away from the place of business of Marshall Oil Company, breaking the hose pipe line, and proceeded out of the City of Rock Hill. Within a few blocks of the Marshall Oil Company's place of business the driver of the truck had his attention called to the fact that gasoline was pouring from the tank truck. He stopped and remedied this situation, which was notice to him that he had not completed the delivery, but of course such notice was not necessary. He then proceeded, not back towards Charlotte and the terminal station of appellant, but to York by way of McConnellsville, a much longer route than if he had followed the plainly charted route from Rock Hill to York, and for the purpose of keeping a "date." If the last stated fact be ignored and the question be then raised that Falconer may be assumed to have been engaged in returning the partially filled tank truck to the terminal of appellant near Charlotte,

the admitted fact is, he was taking a route almost twice as far as the regular route. It is true that respondents contend that there were certain cut-off dirt roads he could have used which would have greatly diminished the distance, but the fact is that he did not use these roads.

Respondents further argue that the road on which Falconer was driving at the time of the accident, if pursued, would take him back to Charlotte. We think the attempted injected issue that Falconer had the option of routes in making his delivery and returning plays no part in the decision of this case. The controlling issue is the purpose he had in mind in traveling the particular route he was on at the time of the catastrophe.

Unless we disregard all of the testimony in the case, no other reasonable conclusion can be reached than that Falconer was in or near the Town of York for personal purposes, and that he was not then engaged in the course of business of the appellant. His sole duty on this occasion was to deliver 4,300 gallons of gasoline to Marshall Oil Company at Rock Hill, and then, and then only, to return the tank truck to the terminal of appellant on West Morehead Street, at Charlotte, North Carolina.

The only reasonable inference to be drawn from the testimony is that with utter indifference to the business and interest of the appellant the driver of its tank truck completely abandoned the business of appellant, while in the midst of performing it and before completing it, and went off on a purely personal mission, which mission had not been accomplished at the time of the accident.

Our every sympathy is with the respondents in this case, but until it be declared by legislative enactment that a tank truck loaded with gasoline or other like explosives traveling our highways shall in law be classed as a nuisance *per se* in

the event damage results from the use of the highways by such truck, the owner of the truck cannot be held answerable for damage inflicted if the owner's servant is not engaged in the business of the owner at the time the damage is inflicted.

Under the facts of this case, the trial Judge should have granted appellant's motion for a direction of verdict in its behalf; and, failing in this, he should have granted appellant's motion for a direction of verdict *non obstante veredicto*. The case should therefore be remanded to the Circuit Court for entry of judgment in favor of the appellant.

Mr. ASSOCIATE JUSTICE TAYLOR concurs.