15778

MACK *ET AL.* v. BRANCH NO. 12, POST EXCHANGE, FORT
JACKSON *ET AL.*

(35 S. E. (2d), 838)

260

*Mr. Roger M. Heyward,* of Columbia, Counsel for Appellants

*Messrs. Sloan & Sloan, August Kohn, Jr.,* and *R. K. Wise,* all of Columbia, Counsel for Respondents,

November 9, 1945.

MR. ASSOCIATE JUSTICE STUKES delivered the Opinion of the Court.

Lemuel Mack, about 57 years old, was employed for over two years as a janitor in a branch Post Exchange at Fort Jackson, near Columbia. His daily employment began at 1:30 P. M. Some minutes, or possibly a half hour, before that time on September 28 or 29, 1943, he arrived on the premises for work and first entered a small room adjacent to the main store in which were kept empty soft drink and beer bottles and crates, laundry, brooms for cleaning and possibly other plunder. The only witness with any actual knowledge of the circumstances was another colored janitor and handyman, Eugene Osby, who was at work and about to be relieved by Mack at 1:30. He thought that Mack entered the anteroom in preparing to go to work, quoting, "getting hold of a box or something or a broom to sweep." Hearing a commotion in the room, Osby and the manager entered and found Mack with his trousers afire, which they extinguished after it had badly burned his left leg below the knee. There was no rule of the employer against smoking by the employees in the room in which the injury occurred and such was the custom.

The employer's report of the injury to the Industrial Commission, pursuant to the workmen's compensation law, signed by a Second Lieutenant as assistant Post Exchange Officer, stated the injury as having been by accident on Sept. 29, 1943 (quoting) "while working he (Mack) spilled lighting fluid on his clothing" which "became ignited, supposedly by a cigarette, burning the worker's leg," and the report contained the further information that there was an infection in the burn and that the physician was "Moore Greene Clinic, Gervais Street, Columbia, S. C." The report was not dated; and the record does not disclose the time of its receipt by the Commission.

Dr. Austin T. Moore filed with the Commission report dated Oct. 14, 1943, wherein the time of the accident was

fixed at noon, Sept. 28, 1943, and the patient's description of the accident was given, as follows: "Spilt some cigarette fluid on left lower leg and another man dropped a match and it burned his leg." Dr. Moore reported second degree burn of the lower left leg as the patient's only symptom of previous or existing accident or disease; that he was first treated on Oct. 14th by the cleaning and dressing of the wound whereupon Mack was sent to the Columbia Hospital and the report indicated that he should be treated there for two or three weeks.

As is seen, the facts in the record relating to the circumstances of the accident are quite meager but the Commission found that such occurred. Difficulty thereabout is obviated by the employer's report above mentioned and the admissions of appellants, particularly in the statement of facts contained in their brief in which it is said that after Mack's entry into the storeroom at about one P. M., he spilled lighter fluid on his trouser leg which was ignited when he attempted to light a cigarette, and that the wound became infected and he was sent to the hospital about Oct. 14th, 1943. He died there Nov. 7th, following.

Dr. James T. Quattlebaum attended Mack while the latter was in the hospital and he witnessed the *post-mortem* examination or autopsy which was made by Dr. Roy N. Barnett. The latter's complete report was in evidence and he also testified, as did Dr. Quattlebaum. Neither would say, despite extended examination, that the burn contributed to, or accelerated, Mack's death. It was largely healed at the time of the latter and these doctors agreed in their opinion that death resulted solely from arteriosclerosis. There was no other medical witness. This testimony will be later discussed in more detail as will the death certificate which was prepared by Dr. Quattlebaum.

The Hearing Commissioner concluded that the accident and death were compensable, that Sara Mack is the surviv-

ing widow and entitled to receive the payments of compensation, except that Effie Ford Mack, the employee's pretended second wife, should be reimbursed $200.00 funeral expenses and also paid a reasonable amount for her nursing services during the deceased's last illness and reimbursed all proper expenses which she paid on account of the accident and illness. The majority of the Commission confirmed these findings upon review and adopted the conclusions and award of the Hearing Commissioner.

Upon appeal to the Circuit Court the award of the Commission was affirmed in all respects and judgment entered accordingly. Question relating to the jurisdiction of the Industrial Commission and applicability of the compensation law was argued before the Circuit Court and decided adversely to appellants, but they now abandon this position and have appealed to this Court upon two main propositions—first, that the accidental injury to the employee did not arise out of and in the course of his employment, and second, that there is no basis in the evidence for the finding of a causal connection between the accidental injury and the subsequent death of the employee.

The first question must undoubtedly be decided against the contention of appellants. It is universally held that the protection of the workmen's compensation law attends a covered employee not only during his hours of labor but before and after, when his activities are incident to his employment. Here they were; he had arrived upon the employer's premises to undertake his regular work, shortly before the usual hour of beginning. There is no suggestion in the record that he went to the Exchange for any other purpose than to pursue his occupation, so his presence there was clearly incidental to his employment. 71 C. J., 662, 671. Horovitz, Workmen's Compensation Laws, p. 159 *et seq. Eargle v. S. C. Electric & Gas Co.*, 205 S. C., 423, 32 S. E. (2d), 240.

And granting that the accidental injury resulted from his effort to gratify his desire to smoke, such activity did not remove Mack from the protection of the compensation law.

The principle is close akin to the common law of master and servant and the incidental doctrine of detour. *Adams v. S. C. Power Co.*, 200 S. C., 438, 31 S. E. (2d), 17. *Carroll et al. v. Beard-Laney, Inc.*, 207 S. C., 339, 35 S. E. (2d), 425, filed September 10, 1945. "Slight deviations are no defense under most state decisions. Thus a slight deviation to get a chew of tobacco, or to ask a fellow employee the time, or to throw away a cigarette, is harmless, and awards were upheld where the injury occurred during the deviation." Horovitz, p. 117.

The reason upon which the rule is founded, insofar as it relates to smoking on the job, is so well stated in the judgment in *Whiting-Mead Company v. Industrial Accident Com.* (Cal.), 173 Pac., 1105, that we reproduce from it the following:

"From these cases there is deducible a rule which is thus stated in one of them (*Archibald v. Workmen's Compensation Comr.*, 77 W. Va., 448, L. R. A., 1916D, 1013, 87 S. E., 791): 'Such acts as are necessary to the life, comfort, and convenience of the servant while at work, though strictly personal to himself, and not acts of service, are incidental to the service, and injury sustained in the performance thereof is deemed to have arisen out of the employment. A man must breathe and occasionally drink water while at work. In these and other conceivable instances he ministers unto himself, but in a remote sense these acts contribute to the furtherance of his work * * * That such acts will be done in the course of employment is necessarily contemplated, and they are inevitable incidents. Such dangers as attend them, therefore, are incident dangers. At the same time injuries

occasioned by them are accidents resulting from the employment.'

"Are we to place the use of tobacco in this list of ministrations to the comfort of the employed? Is its use necessarily contemplated in the course of such an employment as that in which Duarate was engaged? The petitioner, in answering these questions in the negative, places great dependence in the argument that tobacco is used to appease a self-created appetite and not a natural appetite. The argument does not appeal to us. In an endeavor to determine what indulgences of human beings are responsive to the demands of natural, what to unnatural, appetites, we should be carried to the depths of biological and physiological research. Such labor is not necessary. We have the tobacco habit with us, and must deal with it as it is. It will not do to say that mankind would be better for a lack of the weed, even if that statement be true. Tobacco is universally recognized to be a solace to him who uses it, and it may be that such a one, unless he finally shakes off the habit, cannot perform the labors of his life as well without it as with it. In the present war one of the constantly recurring calls upon the public of the world is for tobacco for the comfort of the participants in the conflict. Nor are the books without their cases to the substantial effect that the employer must expect the employed to resort to the use of tobacco as a necessary adjunct to the discharge of his employment."

Report of the cited decision of the California Supreme Court (*en banc*) is also found in 5 A. L. R., 1518 and there is an accompanying annotation in which the editor states that the fact that a employer must expect an employee to resort to the use of tobacco as a necessary adjunct to the discharge of his employment is recognized in every case in which a court has been called upon to pass upon the question of awarding compensation to an employee who was in-

jured through smoking. And several other cases to that effect are digested in the annotation. No authority to the contrary has been cited or found. 71 C. J., 675 contains the following: "If the employee is injured on account of circumstances attending the employment while taking a smoke, there being no objection on the part of the employer to his smoking, the injury arises out of the employment, and in the course thereof." See also, Horovitz, p. 115, and cases in the footnotes.

The second portion of the appeal is a horse of another color.

Applicable to the controversy is the following provision of the compensation law: "(j) The term 'death' as a basis for right to compensation means only death resulting from an injury." Sec. 7035-2, Code of 1942.

Jurisdiction to find the facts in a controversy under Workmen's compensation is exclusively that of the Industrial Commission. Our statute so provides, Sec. 7035-63, Code of 1942; and the decisions thereon are many, 34 SED 2-858 et seq., key, 1939. But the rule is necessarily qualified by the requirement that factual findings of the Commission must be supported by evidence. See the South Carolina cases referred to in 34 (Part 2) SED, supra. Speculation, surmise and conjecture are insufficient.

Causal connection between an injury sustained in a compensable accident and the subsequent death of an employee is plainly a question of fact; and, when controverted, as here, must be found upon the consideration of relevant evidence in order to warrant an award of compensation for the death.

The problem is not new in this court and we need not seek aid in the decisions of other jurisdictions. Reference is had to the cases of *Buckman v. International Agric. Corp.*, 196

S. C., 153, 13 S. E. (2d), 133, *Baker v. Graniteville Co.,* 197 S. C., 21, 14 S. E. (2d), 367, and *Branch v. Pacific Mills,* 205 S. C., 353, 32 S. E. (2d), 1. See also, *Cagle v. Judson Mills,* 195 S. C., 346, 11 S. E. (2d), 376.

As already stated, Drs. Barnett and Quattlebaum were the only medical witnesses. Dr. Moore did not testify and his report, in evidence, made from examination on Oct. 14, indicates that he detected only the burn, and immediately sent the patient to the hospital. His position is very similar to that of the witness, Dr. Howell, in the *Baker case, supra.* There that doctor first examined the employee and found only the traumatic injury and did not discover the pre-existing erysipelas which the proof showed caused the subsequent death. In this case the injured employee was first treated at home by Dr. Monteith who was not produced as a witness at the hearings upon the claim. Strangely, too, the physician who treated the burn in the hospital did not testify.

What is the effect of the medical testimony in the record relating to the cause of Mack's death?

Dr. Barnett, who at the time was a major in the United States medical Corps on duty at the Veterans Hospital, Columbia, the autopsy examiner, testified in part as follows:

"Q. Doctor, what in your opinion, and a result of your autopsy findings, was the cause of this man's death? A. The cause of his death is arteriosclerosis of the kidneys and brain chiefly.

"Q. You say 'Chiefly', what do you mean by that? A. There was also arteriosclerosis of the heart, but I don't believe that was the immediate cause of his death.

"Q. Did he have a thrombosis? A. He had a recent thrombosis in the cerebral arteries.

"Q. What have you to say from his physical or as to his physical condition from your autopsy findings? A. That he

had chronic disease which was a matter of years, very marked and very severe.

"Q. He had had it for some time? A. Yes, sir.

"Q. Now, doctor, you say when you made your autopsy he had a burn on his left shin, did you not? A. I saw the residual, or what was left at that time.

"Q. What condition was that burn in on the left shin at that time when you made your autopsy? A. It was clean and healing well.

"Q. Well on toward recovery? A. Well toward healing.

"Q. Now, could you give an idea of approximately how long, in your opinion, it would have been before the burn would have been completely healed? A. No, I can't, I guess a matter of a couple of weeks, that depends on too many factors which are not available.

"Q. Now, I think the Commissioner asked you awhile ago if a burn such as this man had, could that affect the blood stream, now that is perfectly true, is it not? A. It is perfectly true it could.

"Q. From your autopsy and examination of this man's body, tell us whether or not in your opinion infection did get into the blood stream. A. No, it did not on this man.

"Q. To put it in everyday language, let me ask you as a layman, did the burn cause this man's death or the heart trouble cause it? A. The actual cause of his death was arteriosclerosis.

"Q. The burns did not cause his death? A. It wasn't the immediate cause of death, no.

"Q. Now is lowered resistance, could that have entered into it, are you willing to swear that it did? A. It could.

"Q. It also could not have? A. That is right.

"Q. You as a doctor, don't know whether the burn did or not? A. I don't know whether the burn contributed to his death or not.

"Mr. Sloan: That is all."

By Mr. Heyward:

"Q. You do know what brought about his death? A. I do.

"Q. And it was not burns? A. It was arteriosclerosis.

The following are likewise fair excerpts from the evidence of Dr. Quattlebaum concerning the possibility of causal connection between the burn and the subsequent death.

"Q. Doctor, do you think a man suffering from a wound of that nature for a period of approximately sixty days prior to his death and being confined in his bed, do you think that his general resistance would be lowered? A. I do not believe I could say either way. I do not believe I know.

"Q. Doctor, have you in any way determined whether this arteriosclerosis onset existed before the accident date? A. Well, I do not have any way to know that. Almost certainly it had started long before the injury.

"Q. Doctor, I think in your autopsy report you gave as one of the conditions you found thrombosis, is that right? A. Yes, sir.

"Q. In the layman's language just what is a thrombosis? A. That is a part of the diagnosis of arteriosclerosis.

"Q. Doesn't it mean a clot forms in some artery and cuts off the blood circulation? A. Yes, sir.

"Q. Doctor, that was the cause of his death, was it not, thrombosis? A. Yes, sir.

"Q. Was that the immediate cause? A. Yes, sir; that and the general arteriosclerosis.

"Q. In other words, if he hadn't had the thrombosis he could have still gone on with the arteriosclerosis, couldn't he? A. I don't know that. He could have died from the arteriosclerosis alone.

"Q. Well, if he died from the arterosclerosis, just what physical function happened? A. Well, he would have a thrombosis or a hemorrhage of one of the vessels or may be a general narrowing of the vessels so to a degree that some organ could not get enough blood to continue.

"Q. Now, Doctor, the rupture of a vessel or the forming of a blood clot, thrombosis, could that be caused or contributed to in any way by shock, excitement, undue exertion or impaired resistance? A. Well, I think it could. I mean I cannot produce any proof of that, medical proof, but I believe it could.

\* \* \*

"A. And what would I say about the contributing causes?

"Q. Yes, sir. A. Well, I would say that cases have happened without any contributing cause. Often they happen in their sleep.

"Q. But, on the other hand, the accident could have caused it, could have contributed to it, the shock and excitement from the accident, could it not? A. I would think so, yes, sir, it could have.

"Q. But you are not prepared to state whether it did or whether it did not? A. No, sir.

"Q. Now, Doctor, follow me a bit further. If he had worked in the job that he was working for a period of over two years, satisfactorily and in the same job, and then after the burn he had these conditions from which he died, now, would you say that they could have brought about these conditions? A. Well, it could have helped, I believe, it could have helped.

"Q. Yes, sir. Now, Doctor, as I understand the Compensation Act, if a man has a leg off or an arm off, you take him that way. As I understand, the sum and substance of your testimony is that this shock and the excitement from this burn, which was a severe one, could have contributed to his ultimate death from his thrombosis or the bursting of a blood vessel and it could not have. Is that the substance of your testimony. A. Yes, sir.

"Q. That is as far as you can go? A. Yes, sir.

\* \* \*

"Q. Then you, Jim, are not in a position to say in answer to Mr. Sloan's question whether or not this severe burn contributed to or accelerated his death? A. No.

"Q. You would not say, in other words, whether it did or did not? A. No.

"Q. It could have? A. It could have, I think, but I could not bring out a bunch of medical things to prove that.

\* \* \*

"Q. Now, just one more question. Now, a burn of this nature, is there any possibility of any infection getting in the blood stream or changing the blood stream because of the burn? A. I do not think that that is worthy of consideration. He did not have any high fever, which I think you would have to consider. There was no unusual evidence to suggest anything like that.

"Q. And you don't know that this condition, general medical condition was brought about by the accident itself? A. No. No. That might not be quite fair to say absolutely no. You see, there are a lot of little disturbances that go with the diagnosis.

"Q. Yes, sir. A. And you have already covered that.

"Q. And let me get that right. You don't think it would be a fair answer to state that his general condition could not have had this onset in the accident? A. Well, the arteriosclerosis disease could not. Some little disturbance, that you have already brought out, could.

The foregoing testimony speaks for itself. It cannot be fairly said to support the finding of causal connection between the accidental injury and the death afterward. The Court clearly said in *Branch v. Pacific Mills, supra,* that a cause and effect relation cannot be established by expert testimony of the possibility of it, and quoted with approval the conclusion of the Supreme Court of Pennsylvania in a compensation case (*Fink v. Sheldon Axle & Spring Co.,* 270

Pa., 476, 113 A., 666), that "they (the doctors) must go further and testify at least that, taking into consideration all the attending data, it is their professional opinion (that) the result in question most probably came from the cause alleged." The medical testimony in the case at bar falls short of compliance with the stated rule.

There is yet another nut to crack. It is respondents' contention that the contents of the official certificate of death filed by Dr. Quattlebaum furnish evidence that Mack's burn was a contributing cause of his death or accelerated his demise from arteriosclerosis. It became a public record pursuant to Secs. 5130-5135 of the Code of 1942. The copy in evidence was certified by the State registrar of vital statistics which Sec. 5134 provides "shall be *prima facie* evidence in all courts and places of the facts therein stated."

"*Prima facie*" is a Latin phrase and literally means at first view; on the first appearance. Webster's New International Dictionary, 2nd Ed. *"Prima facie* evidence of fact is in law sufficient to establish the fact, unless rebutted." 3 Bouvier (3rd rev.) 2683. The words "import that the evidence produces for the time being a certain result; but that result may be repelled." 49 C. J., 1346. These definitions are uniform and simple, and none contrary appears. Application of them implies that the factual contents of a death certificate may be contradicted by proper evidence, and we know of none more proper than the testimony of the author who swears to his own previous mistakes * * * that he erred in the preparation of the certificate.

Dr. Quattlebaum testified in this connection as follows:

"Q. Now, it is stated in the Death Certificate here as a part of question 22 on the form that you filled out as follows: 'The principal cause of death and related causes of importance in order of onset were as follows:' Now, will

you read what you have put on that Death Certificate and explain that to us. A. All right.

"Q. Arteriosclerosis, general? A. That means a hardening of the arteries and general means in every part of the body.

"Q. Now, that was the most important cause? A. Yes, sir.

"Q. Now, the next—A. The next one was burn on the leg.

"Q. Well, now, that appears to be your opinion that the burn on the leg contributed to his death? A. No.

"Q. Is that what—A. I listed here anything. as I understand it, anything related to it there at all, under this heading, I might be wrong to do it, but this is my way of doing it, they are not necessarily related at all, causes of death.

"Q. Well, were those two related in any way? A. Well, I don't know. I don't know that. That is questionable.

"Q. It could be, evidently? A. No; the diseases are not related at all.

"Q. Yes, sir. A. But the phenomina as a result of No. 1 could be related to No. 2, but I don't know whether it is related or not.

"Q. You are not willing to swear that the burn was in any way—you are not willing to swear that the arteriosclerosis from which he died was related in any way to the burn which he had on his leg? A. No, sir.

"Q. Now, a little further down in that answer to Question 23 on the Death Certificate form the question is asked, 'No. 23. If death was due to external causes (violence), fill in also the following:' Then it gives you three causes, 'Accident, suicide or homicide'. You have filled in there the word 'accident,' with date of injury, 8-28-'43. Does that mean that in your opinion that this man died as a result of accident that he received?"

\*    \*    \*

By Mr. Heyward:

"Q. Well, Doctor, I will go back to my original question now and I would like for you to answer and explain why in answer to Question 23 you put on the Death Certificate 'Accident.'

"The Witness: The answer is unfortunately there is not enough room to say what should have been said. If the first place, if you say, 'No', then you would not tell the truth. If you said, 'Yes', you would have to say what. And I said 'accident.' As a matter of fact, what should have been said was that an accident occurred, but whether it caused his death nobody knows. So accident merely meant that an accident occurred. And it is not true exactly as answered, unless you attach a statement to the thing I do not see how you could have put it in there.

"Q. All right, Sir, I want you to tell us whether or not in your opinion this man died, or, I should say, if death was due to an external cause, such as an accident in your opinion. A. You mean indirectly?

"Q. No, I mean directly or indirectly, if you know and can say. A. I would say to directly, no, I do not think it caused his death. Indirectly, I don't know whether it had anything to do with it or not.

"Q. You know nothing about him having had an accident, do you, other than the history given here? A. Other than the wound I saw on his leg, and it was healing.

"Q. It was healing and it was getting along all right at the time of the onset of this disease? A. It was healing very satisfactorily.

\* \* \*

"Q. Do you know whether or not it had any connection with his death or any causal relation? A. No, sir.

"Q. You don't know. A. No, sir."

The foregoing constitutes a complete refutation of the implication of the certificate that in the physician's opinion

the burn was a contributing cause to, or accelerated, the death of Mack. If admissible, it destroyed the *prima facie* value of the certificate. And this is not a weighing of evidence, forbidden to the Courts in a compensation case; rather it is a removal of the certificate from the field of the evidence in this case. And this is as it should be. The object of every judicial investigation is the ascertainment of the truth relevant to the issue. It should not be thwarted by the undoubted error of a doctor in the unsworn filling and filing of a routine death certificate.

But respondents say that nevertheless the certificate continues to be evidence of its contents, particularly that Mack's burn contributed to his death; and they rely upon the decision of this Court in *LaCount v. General Asbestos & Rubber Co.,* 184 S. C., 232, 192 S. E., 262. Before considering that authority we refer to an earlier one . . . *Williams v. Met. Life Ins. Co.,* 116 S. C., 277, 108 S. E., 110. It establishes that the recitals contained in a death certificate are not sacrosanct under the statute. The decision was brief and pointed. We quote:

"It or a certified copy is admissible in evidence to establish the matters therein required to be recorded when within the knowledge of the person making the certificate. Matters not within his knowledge and plainly appearing impossible to have been within his knowledge are subject to the objection applicable to all hearsay evidence. In the medical certificate the physician who was called in on November 18th and attended the insured until his death on November 30th certifies to the duration of the alleged disease, a fact which the certificate shows could not have been within his knowledge. This matter being a vital point in the controversy, the Circuit Judge was in error in allowing the statement of the physician as to the duration of the disease to go to the jury."

The case of *LaCount, supra,* is also not contrary to the conclusion we reach, but supports it. There the doctor who prepared the certificate added to the principal cause of death the diagnosis: "pneumoconiosis". At the trial concerning the death he testified that such addition was through error on his part and should not have been entered for that was not the diagnosis. We copy from the opinion of the court, emphasizing the portion presently most important: "The respondent contends that the presumption of fact here raised (by the certificate) was rebutted and completely destroyed by the testimony of Dr. Settle, that pneumoconiosis as a cause of the death of LaCount was put in the certificate through error on his part and should not have been put there at all. *Even conceding this to be true,* we think, nevertheless, that there was other evidence in the case which required the submission of the issue to the jury."

In the instant case the elimination of the evidence that would otherwise be afforded by the death certificate leaves none of substance which supports the alleged fact of causal connection between the accidental injury and death. Thus this case differs from that of LaCount for in the latter there was other relevant evidence to submit to the fact-finding body, there the jury. Here there is no remaining evidence supporting the decision of the Commission, which was here the fact-finder, so its conclusion of causal connection cannot stand. Accordingly, it will have to be reversed for lack of any sustaining evidence.

Reverting to the *Williams case, supra,* it is authority for the present conclusion for in it the death certificate was rejected as evidence because it was hearsay upon the point at issue. It was excluded and, therefore, no evidence. Here it was retracted by the author, under oath as a witness; and the record is devoid of contradiction of the retraction. We see no material difference (as evidence) between an excluded

death certificate and one retracted. Neither is of any importance.

Interesting annotations upon the subject of death certificates as evidence are in 17 A. L. R., 359, 42 *idem.*, 1454 and 96 *idem.*, 324.

Respondents' objection to the testimony of Dr. Quattlebaum in explanation of his erroneous certificate of death is without merit. Our *LaCount case, supra; Metropolitan Life Ins. Co. v. Cleveland's Adm'r,* 11 S. W. (2d), 434, 226 Ky., 621; *Krema v. Great Northern Life Ins. Co.,* 282 N. W., 822, 204 Minn., 186; and other cases in the A. L. R. annotations, *supra.*

Following the precedent of *Logan v. Williams Furniture Company,* 206 S. C., 83, 33 S. E. (2d), 78, the case is remanded to the Court of Common Pleas of Richland County with the requirement of this Court that it be in turn remanded to the South Carolina Industrial Commission with instructions that the latter reform its award agreeable to the conclusions which we have reached, allowing no amount on account of the death of the employee; and it is so ordered.

Modified and remanded.

MESSRS. ASSOCIATE JUSTICES FISHBURNE, TAYLOR and OXNER concur. MR. CHIEF JUSTICE BAKER concurs in result.