15157

CAGLE v. JUDSON MILLS *ET AL.*

(11 S. E. (2d), 376)

April 1940.

*Mr. Stephen Nettles* for appellant, ▉▉▉▉▉▉▉▉

*Mr. J. Robt. Martin, Jr.,* for respondent, ▉▉▉▉▉▉▉

November 7, 1940.

The opinion of the Court was delivered by MR. JUSTICE BAKER.

This proceeding is under the Workmen's Compensation Act, Act July 17, 1935, 39 St. at Large, p. 1231, for the benefit of the widow and two minor dependent children of G. A. Cagle, deceased.

On the night of May 26, 1938, and prior thereto, Mr. Cagle was employed in the weave room of Judson Mills, employer-appellant, as a warp hand. His duties, as such, consisted of tying in warps on the various looms, and both cotton and rayon were run in the same weave room, the same warp hands working on both. At the time in question there were three shifts of hands, working eight hours each, and as a warp hand Mr. Cagle's final duty before leaving the job was to mark up his work on a board known as the Warp Board in order that his successor could take up the work where he left off. Mr. Cagle was working on the second shift, which concluded its work at 1:30 P. M. There existed a custom in the mill or weave room of the mill, whereby the management permitted all section men and warp hands to quit work fifteen minutes before "knock off" time in order to wash and change their clothes before leaving the mill, but the entry on the warp board had to be made after the change of clothes, or at 10:30 P. M.

In accordance with this custom Mr. Cagle left his work about 9:45 P. M. and went to the wash room or a room below the weave room and changed his outer clothes, consisting of coveralls, for his street clothes. The record does not disclose whether he even bathed his face and hands, but he

could have taken a shower bath had he so desired. Upon changing his clothes Mr. Cagle returned to the weave room where he performed his last duty preparatory to leaving the mill for the night, writing the word "Unfinished" opposite the loom he last worked on. As he was writing the word "Unfinished" another employee, Mr. W. H. McGaha, coming on this shift, walked towards Mr. Cagle and asked him a question. When Mr. Cagle finished making his entry on the warp board he slightly turned as if to answer Mr. McGaha's question and fell forward full length on to the floor. There is no question but that the fall was occasioned by Mr. Cagle's suddenly fainting. The point of his chin appears to have struck the wooden floor and with such force as to fracture both of his jawbones, and he no doubt suffered a concussion, resulting in cerebral edema, from which he died on June 3, 1938. Following the fainting and fall of Mr. Cagle he was carried in an unconscious condition out of the weave room on to a platform just outside the mill, where he soon regained consciousness, and according to the record, immediately made these two statements, "I felt a little weak." "I wonder how come me to do that."

The only question in the case is whether the accident arose out of the employment, or, in other words, whether his fall was causally connected with his work?

Mr. Cagle was a man fifty-five years of age, and had worked in Judson Mills for sixteen years, the last several years in the weave room, usually as weaver, but at times as a loom fixer. As aforesaid, he was working in the latter capacity at the time of the accident.

It is admitted that the fall occurred in the course of the employment, Mr. Cagle being on the job at the time. The evidence affirmatively excluded the theory of his fall being due to anything like slipping on a grease spot or stumbling over an obstruction on the floor.

The whole theory of the claimant's case is that the weave room was excessively hot on the night in question, and that

as a result of the excessive heat Mr. Cagle had a heat stroke, which caused him to fall and sustain the injuries from which he died.

The hearing commissioner, Honorable John W. Duncan, rejected this theory of the accident and refused an award. He held that the undisputed evidence precluded the conclusion "that the fall of Mr. Cagle can be proximately attributed to excessive heat or any other unusual atmospheric conditions in the weave room on this particular night".

On appeal to the commission as a whole, a majority thereof found for the claimant, it being a three-two decision. Two of the commissioners, Mr. Duncan and another, dissented. In reversing the hearing commissioner and awarding respondent compensation, the majority commission stated no facts to sustain their position thereabout, and the minority dissenting Commissioners apparently relied on the very full and able statement of the facts, the findings of fact, and the conclusions as set forth by the hearing Commissioner; nor did the Circuit Judge who heard the appeal from the award of the full Commission in affirming same, set forth any facts on which to sustain the finding of the full Commission.

As aforesaid, the case comes to this Court on the single point that there is no evidence in the record to sustain the heat stroke theory or any other theory which causally connects the accident with the employment.

In *Jeffers v. Manetta Mills et al.*, 190 S. C., 435, 438; 3 S. E.; (2d) 489, 490, Mr. Justice Fishburne, as the organ of the Court, stated: "The burden rests upon the claimants to show by competent testimony, not only the fact of injury, but that it occurred in connection with the employment of the deceased; and to furnish evidence from which the inference can logically be drawn that the injury arose out of and in the course of the employment. The award, of course, must be based upon something more than surmise or conjecture. *Rudd v. Fairforest Finishing Company et al.*, 189 S. C., 188; 200 S. E., 727."

Again in *Rudd v. Fairforest Finishing Company, supra* (189 S. C., 188; 200 S. E., 728), cited in the *Jeffers-Manetta Mills* case, is the following: "It is a familiar formula that findings of fact by a Board or Commission on a claim under a Workmen's Compensation Act are conclusive and the appellate court will not review such findings except to determine whether there is any evidence to support the award. It may reverse an award if there is an absence of any evidence to support it, but it is not a trier of facts. If the facts proved are capable as a matter of law of sustaining the inferences of fact drawn from them by the Board, its finding are conclusive in the absence of fraud, and neither this Court nor the Court of Common Pleas is at liberty to interfere with them. This is but an application to Workmen's Compensation cases of the fundamental principle universal in Courts of law, that whether there is any competent evidence is for the Court to determine, but whether the evidence is sufficient is a question for the jury; the function of the Commission being in that respect that of a jury in actions of law. *While the findings of fact by the Industrial Commission will be upheld if there is any evidence on which it can rest, it must be founded on evidence, and cannot rest on surmise, conjecture or speculation.*" (Italics added.) (See cases cited thereunder.)

Excessive heat is a relative term dependent upon the time, place and circumstances, and that which may be termed excessive heat in one instance would in another instance be no more than normal. It is an admitted fact that the weave room of a cotton and rayon mill, in order to get the best production, is kept warmer than the other rooms in the plant, and usually at a temperature ranging from 83 to 86 degrees; and to insure a uniform temperature and humidity, an employee holding the position of "humidifier" is kept in the weave room and furnished an instrument, a "bychrometer" which he carries around with him and this instrument registers the heat and humidity together and gives the relative humidity. The testimony of the "humidifier man" is

that he performed his duties on the night Mr. Cagle fainted and fell, and there was nothing unusual at all about the humidity or temperature that night.

Let us review the testimony of respondent's witnesses. Mr. W. H. McGaha, the employee who was nearest to Mr. Cagle when he fell, testified that it was hotter in the weave room that night than the ordinary temperature outside, that is, outdoors, and in his opinion would vary as much as ten degrees. (The outdoor temperature for that night is not shown in the record.) In direct reply to the question if the heat in that weave room was excessive, the witness replied, "It is warm enough in any weave room to be unpleasant to work in." He further testified that he had been "kind of weak a few times" after working eight hours in the weave room; that it was hotter sometimes than other times; that it was against the rules to raise a window or to interfere with the adjustments on the humidifiers in the room; that he had seen employees have to go outside for fresh air; that he could not detect any difference in the temperature or the humidity of the weave room on the night in question as compared with other nights; that he knew of no one else fainting on that night and did not recall that any employee complained of the temperature on that night; that the weave room is considerably warmer than any other room in the mill and is kept that way; that the humidity system, the "humiditor", controls the moisture, and it was not any hotter on the night in question than is usual so far as he had any knowledge.

Roy Fowler, witness for respondent, testified: "Q. Mr. Fowler, what would you say in reference to the heat in the weave room, was it excessive or not? A. Well, I would say that it is excessive heat. It is hotter than it is outside;" that it is hotter in the weave room than most of the rooms—there may be some rooms as hot, but he didn't have occasion to be in them; that there was a rule against raising windows, and the lower windows are fixed so they will not open, but he could not say as to the top windows; that occasionally he

would become overheated and usually goes to the water house to cool off; that he had known of employees going "outside the door a little bit"; that he thought more heat was kept on when the run was on cotton than when the run was on rayon, but did not know which Mr. Cagle was working on. "Q. Was it any hotter on this particular night than it had been previous to that night? A. I could not say about that, I had just come in. I would not know if there was any difference in that night and any other night, it was always warmer in the weave room."

W. J. Moore, another witness for the respondent, testified: "Q. Mr. Moore, what would you say as to the heat in the weave room, in reference to being excessive or not? A. It is excessive." The temperature kept in the weave room was generally about the same each night that the heat on the night of May 26, (the night Mr. Cagle fell) was in conformity with the usual heat, although he does not recall this specific night; that as far as he could remember, the heat in the weave room for some time prior to the night of May 26, 1938, and for some time afterward had been uniform. He thereafter testified that while he would not say it had been uniform, because sometimes there was some variation—did not know how much it varied, "but there would possibly be some". "Q. But if there was any variation, it would be very little? A. Well, it would not go to the extreme;" that for some time prior and for some time subsequent to the date of Mr. Cagle's injury, the temperature in the room was approximately the same.

Dr. L. H. McCalla, a physician who saw Mr. Cagle about 25 hours after his injury, did not consider him entirely rational when he saw him, found nothing in his examination to indicate that there was anything in Mr. Cagle's "physical make-up" that would cause a fainting spell or anything of that nature—there "would not be anything that would hardly indicate that, I just knew this, he had a severe injury". Did not treat Mr. Cagle for heat stroke, and saw no symptoms that would call for such treatment. Examined the hospital

chart, and there were no symptoms recorded on the chart that could have indicated a heat stroke, and no treatment therefor had been prescribed. The fact that he had not found symptoms that Mr. Cagle had suffered a heat stroke, or had become overheated and fainted, would not necessarily negative that that had not occurred; that one suffering from overheat would through sweating lose considerable salt and chloride, and this is more or less what brings on heat stroke.

Dr. A. M. Scarborough, who performed an autopsy on Mr. Cagle, read his autopsy report showing among other things: "Cause of death: Cerebral oedema (edema?), probably as a result from a fall that he obtained on May 26, 1938, at which time he received the above mentioned fractures of both rami of the mandible."

Dr. T. G. Goldsmith, the family physician of Mr. Cagle, testified: From the description given by the witness, Mr. McGaha, Mr. Cagle's fall was a typical description of one fainting, but he did not say that it was the reaction of one suffering from ordinary overheat. That it is "perfectly possible" if one is subjected to excessive heat, and becomes overheated, for it to result in fainting; that he did not, in his examination of Mr. Cagle, find anything that would cause him, in his physical condition, to be subject to fainting spells, or attacks of unconsciousness. To a hypothetical question presupposing that one worked in a weave room under *excessive heat* for eight hours, sweating freely, and for no apparent reason fainted, he stated that he thought this could be attributed to or was the probable result of the overheated condition. Dr. Goldsmith saw Mr. Cagle about two and one-half hours after his fall, at which time Mr. Cagle told him it was hot in the mill, and at that time he still had on the undershirt and things he had on in the mill, and they were still wet with sweat, and he was still perspiring, but he did not treat him for heat stroke, and treated him to relieve the pain from the injury.

"Q. And from what you saw then, and from the examination which you made, you could not say that his fainting

was caused from overheating or what caused him to fall? A. No, except what he told me then, that he fainted.

"Q. But from your own independent examination and observation of him, you could not tell from any symptoms that were evident at that time as to what caused him to fall? Except that his undershirt was still wet from sweat? A. He told me that he had been hot.

"Q. Would or not the concussion from the fracture, or the injury and the accompanying pain, if the pain were severe, and I assume it was, also have caused considerable perspiring? A. It might to some extent, but at the time I saw him he had no evidence of any concussion.

Q. But he was undergoing considerable severe pain? A. Yes, he had pain in the jaw.

"Q. That would cause him to sweat, would it not? A. I don't think it would cause him to sweat as much as he was sweating, and he told me that he was already wet with sweat before it happened.

"Q. Well, there is bound to be some sweating and perspiring in a mill under average and normal conditions? A. Yes, I imagine so, I have never been in there, I don't know."

There are different degrees of heat stroke, it could be a prolonged one or a short one, and it was entirely possible that all symptoms or evidence of heat stroke would have disappeared before he saw Mr. Cagle; that while an attack of unconsciousness or fainting might result from a number of different things, one of the things it is very likely to result from is overheating.

We do not deem it necessary to go into the testimony of appellants, other than to state that there was testimony corroborating the testimony of the "humidifier man" hereinbefore referred to that the weave room was kept at the usual temperature on the night of May 26, 1938; and two other significant facts: Neither Mr. Cagle nor any other employee complained of the heat in the weave room on that night, and when Mr. Cagle was changing his clothes in the pattern changing department, a room under the weave room,

after having worked seven and three-fourths hours in the weave room, he was in a "playful mood," and "slapped at" a Mr. Bramlett; and appeared to be in his usual good health, and made no reference to the heat in the weave room.

In order to sustain the award of the Industrial Commission "it must be founded on evidence, and cannot rest on surmise, conjecture or speculation." As was stated in *United States Fuel Company v. Industrial Commission*, 310 Ill., 85, 141 N. E., 401, 402, "Liability under the Compensation Act cannot rest upon imagination, speculation, or conjecture   *   *   *"; it must be based upon facts established by evidence.

The only causal connection between the accident and the employment attempted to be shown is the excessively heated condition of the weave room on the night in question, and if we were to take merely excerpts from the testimony of the witnesses, Roy Fowler and W. J. Moore, where they stated that the heat in the weave room was excessive, there would be some evidence upon which to sustain the award of the majority Commission, but when their testimony is read as a whole it is disclosed that the heat or temperature in this room was no greater than usual, allowing for variances, and in fact the witness Moore was unable to recall definitely about the temperature on this particular night. There is no doubt but that the heat in the weave room is greater than in other rooms of the mill, and purposely kept this way, but it is mere surmise and conjecture that Mr. Cagle became so overheated that it caused him to faint. Undoubtedly excessive heat is one of a number of things that can cause one to faint, but there is not a scintilla of evidence that Mr. Cagle became overheated on this night, and following his injury he was not treated for heatstroke. In fact, if he was overheated, he was not aware of it himself, because upon regaining con-. sciousness he said "I felt a little weak," "I wonder how come me to do that" or words to that effect. And certainly he was feeling all right when he was changing his clothes in a cooler

room, because he acted as usual, and was in a "playful mood." Some stress is laid upon the testimony of Dr. Goldsmith as to what Mr. Cagle told him about it being hot in the mill, and he had been perspiring freely, but even then he did not claim that the heat in the weave room was unusual, or that it had any connection with his fainting. And it is but natural that one working in a room where the temperature ranged from 83 to 85 degrees would perspire.

Aside from the theory upon which the case was bottomed, to wit, that the weave room in which Mr. Cagle was working was excessively heated, the term excessively heated being used in the sense that it was hotter than the usual and necessary temperature at which this room was maintained, there is no suggestion that his fainting was the direct result of the usual and normal heat and humidity in the room. In the light of the testimony generally of conditions in this weave room and the privileges allowed employees (we have not encumbered this opinion with a considerable portion of the testimony having no direct bearing on respondent's theory of her case), it would be merely conjecture, surmise and speculation that the temperature and humidity of the room had any causal connection with the fainting of Mr. Cagle. Such would be only within the realm of possibilities.

We have carefully studied the record in this case in the hope that we could find some evidence which would sustain the award made by the full Commission, and affirmed by the Circuit Judge, but have been forced to the conclusion that the hearing Commissioner reached the only logical conclusion, in fact the only conclusion which could be reached based on evidence. He has so succinctly stated his "Findings of Facts" that we reproduce same.

"It is found as a fact that Mr. Cagle had been employed in this same room for a number of years as a loom fixer, warp man, and in other capacities in the weaving department and had never shown any evidence prior to this time of having

been affected in any way by the atmospheric conditions prevailing.

"It is found as a fact that the atmospheric conditions existing in this particular room were kept under constant control because of the necessity for same in carrying out the process through which the cotton and rayon had to go in weaving.

"It is found that the temperature was kept fairly uniform at all times and that the degree was at no time excessive to the extent that it became overbearing so as to make such atmospheric conditions a hazard to the employment. This fact is substantiated by the fact that numerous other employees worked in the same room doing the same type of work over a number of years and, although it is true the condition of the heat may have varied in some small degree, it had not become detrimental to the personal activity of the workers.

"It is further found along this line that a custom was in practice and permitted by the employer whereby employees, should they become affected by the heat, had the privilege of either going outside of the room or to the basement where they could temporarily refresh themselves with water by both drinking and bathing. It would seem perfectly obvious that Mr. Cagle was aware of the foregoing fact since he had been employed in this same room a number of years."

The judgment appealed from is reversed, and the case remanded to the Circuit Court for entry of judgment in favor of appellants.

MR. CHIEF JUSTICE BONHAM, MESSRS. JUSTICES FISHBURNE and STUKES and MR. ACTING ASSOCIATE JUSTICE L. D. LIDE concur.