15686

BRANCH *ET AL.* v. PACIFIC MILLS *ET AL.*
(32 S. E. (2d), 1)

*Messrs. Nelson, Mullins & Grier,* of Columbia, S. C., Counsel for Appellants,

*Mr. H. H. Edens,* of Columbia, S. C., Counsel, for Respondent,

November 3, 1944.

PER CURIAM:

This is an appeal from an order of the Circut Court affirming an award to the respondents by the South Carolina Industrial Commission of the maximum death benefits under the Workmen's Compensation Act, Act July 17, 1935, 39 St. at Large, p. 1231, on account of the death of Oscar L. Branch, an employee of the appellant, Pacific Mills, who died on the morning of April 19, 1943, while on duty in the slasher room of Pacific Mills, as the result of a stroke or cerebral hemorrhage.

The exceptions raise the question that there is no testimony to sustain the conclusion that the death of the employee resulted from a cerebral hemorrhage, by accident, arising out of his employment.

Section 2, subdiv. (f) of our Workmen's Compensation Act, defines the words "injury" and "personal injury" as "only injury by accident arising out of and in the course of the employment, and shall not include a disease in any form, except where it results naturally and unavoidably from the accident;" and subdivision (j) of the same section provides:

"The term 'death' as a basis for a right to compensation means only death resulting from an injury."

It has been well stated that "the two parts of the phrase 'arising out of and in the course of the employment' are not synonymous, and both must exist simultaneously before any Court will allow recovery under a compensation act so worded." " 'Arising out of' refers to the origin and cause of the injury, whereas 'in the course of' refers to the time, place, and circumstances of the occurrence." See *Ryan v. State Industrial Commission*, 128 Okl., 25, 261 P., 181; *Ridout v. Rose's 5-10-25¢ Stores*, 205 N. C., 423, 171 S. E., 642.

Courts have gone far in affirming the findings of Commissions charged with the administering of Workmen's Compensation Acts since on occasions their findings of fact have been based on slight testimony. In the recent case of *Crawford et al. v. Town of Winnsboro et al.*, 205 S. C., ..., 30 S. E. (2d), 841, 848, this Court felt impelled to remark as follows:

"The functions of the Workmen's Compensation Commission are a dual character, administrative and judicial. In the field of judicial action, the Commission may be likened to a judge trying a law case without a jury. The rule that the findings of fact made by a circuit judge in such a situation, when founded upon testimony which would have been sufficient to support the verdict of a jury, may not be disturbed on appeal, applies to an award made by the Workmen's Compensation Commission when the award comes before the Circuit and Supreme Courts for review. Conversely when the testimony before the Commission does not create a reasonable inference in support of the claimant's case, it is the duty of the Commission to reject the claim.

"From the judicial aspect of the Commission's functions it follows that the trial conducted by the single Commissioner and the review made by the whole Commission are not

for the purpose of determining whether there is in the case in hand some item or element of testimony upon which the Commission may hang an award for the claimant, or an order refusing an award; on the contrary, whether the testimony be meagre or voluminous, direct or circumstantial, the question in each case is whether on the whole record, giving effect to all of the testimony adduced, there is sufficient evidence to persuade the Commission as a judicial body that the case made by the claimants has been proved."

The issue raised by this appeal makes it our duty to search the record for the purpose of ascertaining if there is any competent evidence to sustain the award of the Industrial Commission, which award was affirmed by the Circuit Judge in a brief order, citing the case of *Westbury v. Heslep & Thomason Co.*, 199 S. C., 124, 18 S. E. (2d), 668.

The decedent, Oscar L. Branch, about 55 years of age at the time of his death had been employed at the Pacific Mills for twelve years or more, and for two or three years prior to his death had been employed as a card grinder. In addition to his duties as card grinder it was necessary for him to go into the slasher room once a week, or as often as the condition of the dust pipes require it, to clean and supervise the cleaning of the dust pipes in this room. He was furnished with colored helpers to do the manual labor, but on occasions had himself performed some of the labor. Ordinarily the helpers did the actual labor, and Mr. Branch merely supervised their work. The temperature in the slasher room was kept considerably higher than in the other rooms of the Mill, this being necessary in order to dry out the yarn, and this condition is not peculiar to Pacific Mills.

For about two and one-half years prior to his death, Mr. Branch had what is called hypertension, which is a cardiovascular disease where a man's blood pressure is over 200, and Mr. Branch's blood pressure ranged from 240 to 250.

When a person is in this condition it is known (expected?) that the cause of his death is going to be a stroke. During this period of time Mr. Branch had not been able to work regularly, although for the period of six months preceding his death he had worked fairly regularly, being off only a day or two out of every three or four weeks.

Mr. Branch was sick on Sunday, the day before his death, and remained in bed the greater part of that day. When he came to work at the usual time (7 o'clock) the following morning (the morning of his death), he appeared pale, and was heard to remark that he felt so bad he didn't feel like living. At about 7:30 o'clock, while he was on his way to the slasher room, an employee of the Mill requested Mr. Branch to help him move a Werner Brush, and he replied, "I feel so weak I don't know whether I could or not," but took hold of the brush and helped move it. The brush had an estimated weight of between thirty and forty pounds. Mr. Branch went on into the slasher room where a colored employee, his helper, had preceded him. This helper testified that he handled the ladder, and was the one who cleaned out the dust pipes; that Mr. Branch held the ladder while he was up on it for about ten minutes and until another colored helper came in and relieved Mr. Branch, at which time Mr. Branch went over and sat down on a beam. Another employee of the Mill testified that he was in and out of the slasher room during the process of the cleaning of the dust pipes, and saw Mr. Branch moving the ladder around, and also saw him on the second step of the ladder with a small rake in his hand—the rake used to clean out the pipes, but didn't know if Mr. Branch proceeded up the ladder. While the two helpers were engaged in cleaning the dust pipes, and after Mr. Branch had been sitting on the beam for about ten minutes, he got up and started walking towards the ladder, whereupon he commenced to slump or go down, but was caught by his helpers before falling to the floor. He did not trip or stumble over anything. He died shortly thereafter.

We have of course not undertaken to set out above more than the salient facts, but a careful reading of the record discloses that Mr. Branch did nothing on the morning of his death requiring physical exertion other than to assist in moving a brush weighing not more than forty pounds and moving a ladder, the weight of which there is no estimate, and that on neither occasion was he apparently affected by such slight exertion.

The only medical testimony in the record is that of Dr. R. L. Sanders, the physician of the deceased, and it is from his testimony that we have largely depended in relating the physical condition of Mr. Branch for two and one-half years preceding his death.

From a careful study of Dr. Sanders' testimony, we are impressed with his desire to honestly truthfully and patiently answer all questions propounded to him. He had testified at lenght on both direct examination and cross examination, but a practical summation of his testimony relating to the cause of Mr. Branch's death is contained in his re-direct examinations, and his re-cross examination, which are set out below:

### Re-direct Examination

"By Mr. Edens: Q. A man in the general physical condition Mr. Branch was in, was it not more exertion on his part to hold that ladder in an over-heated room, than it would have been for a person in very good physical condition to do the same duty? A. Yes, sir; of course that would be more exertion on his part due to the fact that he was in bad physical condition, and the room being over-heated and he exerted himself more than a normal individual would who was working in that place.

"Q. Of course, a man in his general physical condition is more predisposed to have an attack such as he had than a normal person, or a person with normal blood pressure. A., That's right.

"Q. And I believe it is more of an exertion on the part of anybody normal or otherwise, to perform duties in an over-heated room than it is in a room having normal temperature. A. Why, sure; if the temperature is higher, the heart has to work more, and the pressure would be up more, than if the temperature was normal.

"Mr. Edens: That's all."

### Re-cross Examination

"By Mr. Grier: Q. A man in Mr. Branch's condition was just as apt, and the chances were just as great for him having a stroke, even if he had never gone to the mill that Monday morning weren't they? A. Yes, sir; I think it was. I mean, him having his pressure that high and having been sick the day before, of course, you have to assume the pressure was high, and he may have even had a stroke on the way to the mill.

"Q. In other words, you just can't tell. A. No, you can't state anything definitely that caused him to have the stroke, it is all based on possibilities, probabilities and assumptions.

"Q. In other words, he may just as well had that strike while he was in bed Sunday night as he did have it Monday morning, or he might have worked all day at the mill and then had it after that, or he could have stayed at home and not even worked, and still have had it. A. He may have worked all day at the mill and still have had it, or as you say, he may not have even worked, and still had it, in his condition.

"Q. He is just as likely to have had it Sunday night as if he hadn't gone to the mill? A. Yes, he could have had the stroke at any time.

"Q. And the chances are that his blood pressure had reached such a height that if he hadn't gone to the mill, he would have died anyway that morning? A. Yes, sir; he might.

"Q. So then, you are not in position to definitely say that going to the mill that morning had any connection or had any relation to his death, you can't be positive about it? A. No. You see the thing I am trying to tell you is that I am only assuming from the way I answered Mr. Edens' question, or only assuming from the fact that he was in an over-heated room, and he had been sick the day before, and he had gone in and exerted himself some, of course, you have to assume that was the factor that brought about the man's stroke, that's just an assumption though. He could have had it without even going down there though. The only thing I am trying to make clear, is that I cannot tell definitely anything that would have caused the man to have a stroke at all.

"Q. If he hadn't exerted himself at all, assuming the testimony shows he did not exert himself, yet he still had this stroke, would you say just putting his hand on this ladder was the cause of it? A. No, sir; I don't. If he didn't exert himself or attempt to do something, I would say that had nothing to do with it.

"Q. Because he sat down, then got up and walked around a few steps and fell over with a stroke, do you think putting his hand on the ladder caused it? A. No, sir.

"Q. What you say is that you cannot put your hands on anything that you can definitely say caused the stroke. A. No, not anything definite that made him have it.

"Mr. Grier: I believe that is all."

### Re-direct Examination

"By Mr. Edens: Q. Doctor, if a fellow did have a stroke in an over-heated room after holding a ladder, what is your opinion as to what precipitated it; assuming that he was predisposed to have attacks, would that have immediately precipitated or caused the stroke? A. You have to assume that he brought on the stroke and that the man was in this over-heated room exerting himself holding a ladder and I can't do that; but this man here being at work at a place that was

over-heated and had a stroke while on the job, so the only thing you can assume is that it possibly was the factor that brought on the stroke.

"Q. Is that your opinion in this case? A. Yes, sir; that is the only conclusion I can come to, of course, as I said, he could have had it without even going down there.

"Q. But since he did happen to go down there and under the circumstances related to you, it is your opinion that is what precipitated the stroke? A. Yes, sir; you have to assume under these conditions that was the cause of it.

"Mr. Edens: That is all."

Dr. Sanders, the witness upon whom respondents depended to prove a causal connection between the employee's work and his death, frankly testified that he was unable to state anything definitely that caused the deceased to have the stroke, "it is all based on possibilities, probabilities and assumptions."

When Dr. Sanders' testimony as a whole is analyzed, it will be seen that such portions thereof as suggest a causal connection between Mr. Branch's work and his death are based on conjecture, surmise and speculation. His testimony shows that it is just as probable that the deceased, in his condition, would have suffered a stroke if he had not gone to work on the morning of his death; and that he "might have started to bleeding before he even went to the mill, maybe, or maybe on the way to the mill, you can't tell where or when he started to bleed, all you know is when he collapsed which caused him to be unconscious." He also testified that Mr. Branch was just as apt to have had the stroke or cerebral hemorrhage on Sunday when he was sick and in bed, as in the mill, assuming that he did no physical labor.

"While the findings of fact by the Industrial Commission will be upheld if there is any evidence on which it can rest, it must be founded on evidence, and cannot rest on surmise, conjecture or speculation." *Rudd v.*

*Fairforest Finishing Co.,* 189 S. C,. 188, 200 S. E., 727, 728, and quoted with approval in *Cagle v. Judson Mills,* 195 S. C., 346, 11 S. E. (2d), 376.

The able Circuit Judge, in his decree affirming the award of the Industrial Commission, cited as controlling the case of *Westbury v. Heslep & Thomason Co.,* 199 S. C., 124, 18 S. E. (2d), 668, but in this we think he was mistaken. In that case the employee had an accident. He was standing over a sash planing an uneven spot when his foot slipped and fell upon the sash in such a manner that the lower part of his stomach, or solar plexus, struck the corner of it. He immediately complained of great pain, and said he was going to die. Shortly thereafter he left the place where he had been working with his tools in his hand, but after proceeding for about twenty-five feet, fell to the floor unconscious. He was carried to a hospital in a precarious condition, but finally rallied, and improved to such an extent between Thursday, the day of the accident and the following Sunday, that it was thought safe to remove him to his home. On the next day he died, death being attributed to coronary occlusion, or thrombosis. A physician testified that in his opinion the shock from the fall which the deceased had suffered caused the heart attack, which caused his death.

The facts in the case of *Green v. City of Bennettsville,* 197 S. C., 313, 15 S. E. (2d), 334, are in part similar to those of the case under discussion, but in that case there was positive testimony of over-exertion and that this over-exertion and sudden heavy duty on the weakened heart muscles was the proximate cause of the death of the decedent.

We quote with approval from the case of *Fink v. Sheldon Axle & Spring Co.,* 270 Pa., 476, 113 A., 666, 667, a case involving the Pennsylvania Workmen's Compensation Act, 77 P. S., § 1 *et seq.,* wherein the Court said: "It must be understood, however, that when, in cases of this class, expert testimony is relied on to show the

connection between an alleged cause and a certain result, it is not enough for the doctors to say simply that the ailment in question might have resulted from the assigned cause, or that the one could have brought about the other; they must go further and testify at least that, taking into consideration all the attending data, it is their professional opinion the result in question most probably come from the cause alleged."

The record in this case failing to disclose any competent and positive testimony, or testimony from which a reasonable inference can be drawn, that there was any causal connection between the employee's work and his death, the judgment of the Circuit Court is reversed, and the case remanded for entry of judgment in favor of appellants.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES FISHBURNE, STUKES, TAYLOR and OXNER concur.