16170

FLEMING v. APPLETON CO. *ET AL.*

(51 S. E. (2d) 363)

*Mr. Stephen Nettles,* of Greenville, *for Appellants,*

*Mr. R. L. Ballentine,* of Anderson, *for Respondent,*

January 13, 1949.

STUKES, Justice.

Respondent was awarded workmen's compensation for total disability and from affirmance by the Court of Common Pleas the employer and its insurance carrier have appealed upon the grounds that there was no proof of injury by accident and, on the contrary, the evidence establishes that respondent's disability is due to disease.

He had been employed in other departments of the appellant cotton mill and was transferred about Nov. 1, 1945 to the trucking department where heavy boxes of cotton goods, weighing up to six or seven hundred pounds, were pushed by respondent and others on carts or trucks, which was heavier work than he had been doing before. On the third day on this new job, he said in testimony, "all at once something hit me just like that; I went all to pieces, a nervous condition, and I have been that way ever since." He was taken home in the automobile of a fellow-worker, to a hospital a day or so later and dismissed on the next. He was examined afterward by physicians whose testimony will be presently stated. The examining doctor at the hospital was not available as a witness and the hospital record was not introduced.

Quoting further from respondent's testimony before the Commissioner, after saying that he had recently unsuccessfully tried to do farm work, he described his condition, as follows: "Something seems like gets all over me and I get all to pieces. I don't know what's the matter with me, and the doctors, I don't reckon they know. If they do they ain't never done me no good, I know that. I just get all to pieces; I don't know what happens to me; and I have been that way ever since that night." He further said that he could not tell the cause unless, quoting again, "it was straining on them big boxes and getting too hot. I got awful hot, couldn't get my breath hardly." He added that, "it did not seem to

be so hot, but I got awful hot that night." As stated, it was November and naturally there was no evidence of high temperature.

Respondent offered a medical witness, Dr. Harris, who testified that he treated respondent from Nov. 5 to Nov. 18, 1945, for low blood pressure, anemia and tremor of the hands, a sort of St. Vitus dance. The latter was a fine tremor of the hands which rendered the patient unable to work with them; "nervous exhaustion," he said, "if you want to call it that", which could have one of several causes. He gave as his opinion that respondent simply gave out at his work, which latter had a tendency to cause it or caused it. This testimony was qualified, practically withdrawn, on cross-examination by the doctor's statement that he did not know the cause, which might have been lack of food, lack of sleep or excessive drinking and he reiterated that he treated respondent for low blood pressure, nervousness and anemia. He said that exhaustion from overwork would probably be relieved by rest and that failure to work would develop a mania for not working which some individuals cannot control. The witness had not talked to respondent recently and declined to give a present diagnosis.

Another physician, Dr. Rainey, testified in behalf of appellants. He examined respondent on May 24, 1946, and said that he found no organic disease and was given no history of injury. The symptoms were moist hands and a coarse tremor and variability of the pulse rate which resulted in a diagnosis of, quoting, "neurocirculatory asthenia, or soldier's heart, which is what they call it in the Army, and on the basis of constitutional inadequacy." The witness was asked to explain this diagnosis, with the following result: "A. Well, those individuals have a certain physical setup; they are unstable individuals. They find it impossible to apply themselves to any stated task with any degree of regularity and with any degree of efficiency, and they have

profuse sweating under the arms and they have cold, moist hands and a coarse tremor of the hands, fingers.

"Q. What causes the tremor, Doctor; can you tell us that? A. It fits in with the general course that these people take and it's on the basis of constitutional inadequacy or lack of —well, I think that just explains it better than anything, constitutional inadequacy. It was one of the great causes for individuals being disqualified for service in the armed forces, and it was probably the cause of the greatest number of hospital days in the Army of any other thing. In the Army it was just a question of keeping them in the hospital long enough to get them out.

"Q. Would you say it was due to overwork? A. No; people have it and never hit a lick.

"Q. And you found nothing organically wrong with this man at all? A. No."

The following is from the cross-examination of this medical witness and concluded his testimony:

"Q. You testified a minute ago, as I understood you, that this constitutional inadequacy might have been over a period of years? A. I think he's had that all the time.

"Q. If I did not misunderstand you, did you say that any work or worry or over-exertion or heat could break him down in one night? A. I didn't say heat. I said that working under unpleasant conditions, or working at work he did not like, or working under pressure, or trouble at his work with anybody, or trouble at home, or trouble in his environment or danger in his environment, or anything such as that, acts as a sufficient cause to break such an individual down.

"Q. And something did break this man down, didn't it? A. It depends on his work record.

"Q. Presuming that he had been working for five or six months in this mill, and all of a sudden he went haywire there that night, on November the 3rd, would you say that one night's work there broke him down? A. I think not the work but the thoughts of the work would break him down.

I never have seen hard work break anybody down, but it's the worry and anxiety and the mental and physical discomfort that goes with working that breaks individuals down.

"Q. And if it wasn't for the work angle of it he would not have been broken down, would he? A. Not the work angle, because the work angle will not break anybody down, the actual manual work.

"Q. But the fact that his condition was connected with work, work being connected with his condition caused the breach, didn't it? A. Well, according to the individual's testimony, he just—he evidently didn't like the fact that he was transferred from the first to the second shift, and didn't like the fact he was transferred to another job, away from that job to which he had been accustomed.

"Q. And the break came, didn't it, Doctor? A. Yes.

"Q. Was that sufficient to break him? A. Yes, in a constitutionally inadequate individual."

There was effort on the part of appellants' counsel to obtain testimony from respondent that he had drunk intoxicants excessively in the past which resulted in his admission, in effect, and that of his wife who also testified, that he was in the habit, until recently, of drinking on week-ends but did not drink for as long as a week at a time and did not get helplessly drunk.

The relevant provision of the compensation law is the definition contained in Code, Sec. 7035-2(f), as follows: "(f) 'Injury' and 'personal injury' shall mean only injury by accident arising out of and in the course of the employment, and shall not include a disease in any form, except where it results naturally and unavoidably from the accident."

It is fundamental that a compensation claimant must bring himself within the law by offering evidence or admission of an accident; this burden is upon him. Here there was no evidence of such; on the contrary the record admits only of the inference that there was no un-

usual condition or event in his work environment; therefore, there was no accident. The fact that he gave out, as one of the medical witnesses expressed it, when employed at heavier work than he had formerly done, is alone not evidence of an accident. It was a usual form of work in a cotton mill and others engage in it regularly. Similarly employed was the claimant in *Burnett v. Appleton Co.*, 208 S. C. 53, 37 S. E. (2d) 269, where the circumstance of upgrade movement of the trucks made the work harder than it appears to have been in this instance, yet the disability was found to be non-compensable. There was no evidence here of any effect of the work upon claimant's physique. The climax in his latent nervous or mental condition probably had to come at some time; for aught in the evidence it might have come as well when he was off-duty as when at ordinary work, as here. It is but conjecture to say upon the evidence that there was causal connection between respondent's work and his nervous breakdown. *Cagle v. Judson Mills*, 195 S. C. 346, 11 S. E. (2d) 376. Other recent similar and controlling cases are *Branch v. Pacific Mills*, 205 S. C. 353, 32 S. E. (2d) 1, and *Radcliffe v. Southern Aviation School*, 209 S. C. 411, 40 S. E. (2d) 626.

Reversed and remanded for entry of judgment for appellants.

BAKER, C. J. and FISHBURNE, TAYLOR and OXNER, JJ., concur.