16262

BURGESS *ET AL.* v. BELTON MILLS *ET AL.*
(55 S. E. (2d) 292)

*Messrs. Watkins & Watkins,* of Anderson, *for Appellants,*

*Mr. James B. Pruitt,* of Anderson, *for Respondents.*

September 14, 1949.

TAYLOR, Justice.

By this appeal we are asked to review the decision and findings of the Industrial Commission and the Circuit Court, awarding death benefits to the respondents for the death of Geneva Burgess.

Mrs. Burgess, on her first day of work, August 30, 1945, at the Belton Mills, Belton, S. C., was alleged to have "sprained" her back while picking up a quill box that had

overturned. Claim was duly filed with the Industrial Commission, and, pursuant thereto, an award was made for disability compensation, and payments were being made thereon at the time of her death, July 31, 1946. Thereafter, claim was duly made for death benefits, and notice of such hearing bore the same docket number as the claim for disability compensation. Appellant promptly filed objection on the grounds that the two were separate claims, involving separate parties. Pursuant to this hearing, the Commission made its award in favor of respondents and held that the two claims would be considered as one. Appellants then appealed to the Circuit Court which reversed the Commission on its ruling that the case was one and the same, and held that this is another claim separate and apart from that for disability compensation, in that it is for death benefits and the parties are different, but affirmed the award of the Commission.

There is no appeal from the ruling of the Circuit Court that the two claims were separate and distinct, the one from the other, and should be so treated, but appellants come to this Court contending that there was no testimony of a causal connection between the injury suffered by Mrs. Burgess and her death.

Since there is no question as to who are the proper parties, we will proceed to examine the record to ascertain whether or not there is any competent evidence to the effect that the deceased's death was attributable to or accelerated by the accident heretofore referred to.

A review of the testimony shows that Mrs. Burgess, on the date in question, arighted her quill box which had turned over, experiencing pain as she did so, stating, "the pain struck me up and down my backbone and come straight around me." She continued to work the rest of the shift and that of the following night, suffering pain.

Dr. T. Willis Martin testified as follows:

"Q. I will ask you, Doctor, if in 1943 you discovered that Mrs. Burgess had a cancer of her breast? A. In about 1943

I delivered a baby for her and found a lump in her breast, and she couldn't succesfully nurse the baby. There were glands enlarged in the left armpit—I believe it was the left armpit—so we had to dispense with that breast during that nursing siege, and I advised her to go to Dr. Wrenn and to the clinic and be checked up, but she did not go: she objected to going and kept putting it off and did not report. I think that was in 1943. So we just let the matter drop and I saw her from time to time and checked up on it two or three times. It didn't seem to be enlarging or growing rapidly and the glands hadn't made very much change, so all I could do was just to suggest each time, and I think I made three different suggestions over a period of a year or a year and a half.

"Q. Doctor, did Mrs. Burgess come to you some time in 1945 and tell you that she had fallen in the mill or something? A. Yes, sir. I think it was the last of August in 1945 that she reported up to the office one morning and said 'Last night I fell and hurt my back in the mill.' I examined her as thoroughly as I could—I had not acquired my X-ray then— and I couldn't make out any injury; there was no apparent bruise or anything. So I suggested, in view of what we had found out about her previously, that she go and let Dr. Wrenn X-ray her back and also pass on that breast while she was over there. She put that off, put me off several weeks before I finally coaxed her over there, I think it was, but she finally reported to Dr. Wrenn, and he immediately sent me a written report that he found destruction of one of the vertebrae. partial destruction of one of the vertebrae of the back.

"Q. Doctor, when she came to you and complained about having fallen there in the mill, did you find any physical evidence of a strain or a muscle spasm? A. No, sir. I went over her carefully. There was a tender area in her back. There was no bruise, discloration or swelling. I couldn't make out any definite physical appearances of a strain or a trauma.

"Q. You say that you did find a tender place in her back? A. Yes, sir.

"Q. Doctor, if her cancer had advanced to the point that part of the backbone was eaten away, in your opinion would or not that have caused the tenderness that you found; could it or not have caused it? A. Yes, sir; it most likely would have."

Dr. J. R. Young testified:

"Q. Doctor, will you take it up there and tell the history that you got from Mrs. Burgess and your findings? A. She gave a history at that time that since the spring of 1943 she had had a lump in her left breast.

\* \* \*

"A. She said that in recent months the tumor in her left breast had gotten a good deal more noticeable. She had had a baby six months before in March, and she developed a big lump in her arm. Her family physician had referred her to Dr. Wrenn. She stated also at that time when she came to the clinic on that day that in August, the preceding August, while at work, she had strained her back.

"We examined her and found that she did have what we call an inoperable cancer of the left breast. What we mean by that is that it had spread from that side to the glands in her arm; and we X-rayed her back and found it had spread to the spine, so it was not an operable case. Dr. Wrenn treated her with X-ray, and she responded dramatically almost to the X-ray treatment. Her breast shrank up in size and the lump in her arm almost disappeared and she got definitely better from the standpoint of symptoms. A few weeks later, the last of October, she came back, and she was about five months pregnant. On the opinion of her family physician, Dr. Martin and I, we all felt that should be interrupted. So I operated on her abdomen, and the operation consisting of removing the womb with the baby in it and the ovaries. The reason that was done was to slow down the cancer process. She stood that operation all right in October, and following that she looked to us like she made definite improvement. She gained some weight, looked better and felt

better from October until about the following June; she picked up in weight and looked definitely better.

"In July of 1946 Dr. Martin referred her back to the hospital. She, in the meantime, had become paralyzed; she had had what is commonly called a stroke and was paralyzed on her right side. She was admitted there, of course, in the ward, in the bed, and examination revealed that she had large masses in the upper part of her abdomen around the region of her liver, connected to the liver, and the paralysis on her right side involved both lower and upper extremities, and our opinion was, though we didn't prove that by autopsy, that she probably had a malignant spread to the brain. She died there; having been admitted on the 25th of July, she died on the 31st, about five o'clock in the morning. We did not do a postmortem on her, but our opinion was that she died of cancer that began in the breast and spread all over her body, particularly to the liver, and from a symptomatic standpoint we believe it spread to the brain, though we didn't prove that. Near the liver, when I operated on her the previous October, we found at that time she had a spread of cancer to her liver. We had the liver in our hand and felt the spread of cancer to the liver. We knew when we operated on her it was not operative, couldn't cure her, but would help her; apparently it did give her a few months of apparent freedom of symptoms, apparently comfortable living.

"Q. Doctor, was this patient in a cancerous condition from 1943—you say that is when she gave you the history? A. Yes; according to the history, she said she had a lump in left breast in the spring of 1943, though I didn't see it until October, 1945.

"Q. Doctor, when she first came to you she was complaining of cancer. Is that correct? A. The first time I saw her was on that date. We found her to have cancer. What she was complaining of at that time was pain in the back. We X-rayed her and found she had a cancer in the back, had cancer in the breast, had cancer in the arm, and had a cancer of the backbone.

"Q. Doctor, if Mrs. Burgess had strained her back in her work, would that produce cancer? A. No.

"Q. Was it when she first came to you that she was complaining of pain in the back, or was it some time after that when she first mentioned the pain in the back? A. The first time I saw her—I think I am correct in saying that Dr. Wrenn had seen her before I saw her in the Cancer Clinic; that's my recollection of it—the first time I saw her on the 4th of October in the Cancer Clinic as a patient her complaints were referable to her back, though she had just what I told you, cancer of the breast and cancer in the arm and cancer of the backbone.

"Q. Now, then, Doctor, if she had had cancer and it had developed to the point which you found it, would you expect that she would have pain in the back from the cancer? A. Yes. When a cancer spreads to the spine it gives a great deal of pain; and in her case it was very largely relieved by *x*-ray treatment, it was improved a great deal. The *x*-ray picture of cancer is specific, don't anything else look like it, and when she was treated by *x*-ray treatment to the spine her symptoms got right much better, her pain.

"Q. Doctor, your *x*-ray pictures of her spine, did they show any evidence of her having fractured her back or injured her back? A. No; there was no evidence at all of any fracture or other injury that you could demonstrate.

"Q. Now, then, Doctor, you say that she became paralyzed. What was the cause of the paralysis? A. Well, it was of central origin. I mean by that the cause of it was in the brain. We didn't do a postmortem on her. Ordinarily what causes a paralysis of one side is a bleeding in the skull or blood clot forming in there somewhere, and it can come from a growth. With the history she gave of having had cancer and it having spread to the two known places, her spine and her liver, I think it's highly probable that she had cancer of the brain.

"Q. Doctor, suffering from cancer as she was, would that cause paralysis to come on? A. It wouldn't unless it involved

the brain, the kind of paralysis she had. It was of the upper extremity and lower extremity on the right side, what we call a paralysis of half of the body.

"Q. You say that you found masses connected with the liver. What caused that? A. That was cancer.

"Q. Doctor, in your study of the *x*-rays, state whether or not they showed evidence that she would complain of pain in her back. A. Yes, sir; the pictures that were taken about the 4th of October, 1945, showed that the eighth dorsal vertebra, that is, the backbone four bones above the bottom of the ribs, right below the tip of the shoulder blade, that bone was almost eaten away, almost destroyed; it was partially collapsed, and it was the seat of a cancer. In her case, and in many other cases I have seen of cancer in the spine, it gives pain, it gives a great deal of pain, and in her case the pain was markedly helped by *x*-ray treatment.

"Q. Doctor, the condition you found in her spine, in your opinion, was caused by what? A. It was caused by cancer. The appearance of cancer in the spine is entirely different from the appearance of fracture or arthritis or anything of that sort. It's a bone-destroying lesion; the bone is just eaten away.

"Q. In other words, the results of a trauma to the spine and the result of cancer working on it, there is a marked difference; Is that correct? A. Entirely different, yes, sir.

"Q. Do you think that you could possibly mistake the effects of cancer and the effects of trauma on the spine? A. No. Anybody could make a mistake, but that particular mistake I don't believe I would make.

"Q. They are definitely unlike? A. Yes, markedly dissimilar, entirely dissimilar.

"Q. Doctor, I will ask you if your *x*-rays of her spine showed any arthritis. A. No, they didn't show any arthritis.

"Q. Doctor, in your examination and treatment of Mrs. Burgess, did you find anything that would suggest even that her death was due to a back strain some time in, say, Aug-

ust of 1945? A. My opinion was that her death was due to cancer, and I so recorded it.

\* \* \*

"Q. Doctor, you mean a twist or bruise to a muscle around a cancerous spot wouldn't affect that cancerous spot at all? A. The facts are that that cancer in her spine got much better after her examination and x-ray, the x-ray pictures that we took along, got demonstrably better.

"Q. But she never did get able to go back to work? You wouldn't have passed her for employment? A. No, I don't think she should have worked."

A portion of Dr. J. B. Latimer's testimony appears as follows:

"Q. Doctor, I am going to ask you, in your opinion, whether, or not a strain of a muscle of the back alone would aggravate the condition in which Mrs. Burgess was, according to the history of the case as you know it. A. I don't think so, no.

"Q. Doctor, as a result of your study of the case, that is, hearing the testimony of these two doctors and your conferences with Dr. J. R. Young about Mrs. Burgess, what was the cause of her death? A. Cancer.

\* \* \*

"Q. Doctor, from what you have learned of this case, do you think any strain that Mrs. Burgess had in August, 1945, contributed in any way to her death? A. No, sir.

\* \* \*

"Q. Doctor, would in your opinion a strain of a muscle of the back cause the vertebra to disintegrate to the extent Dr. Young reports? A. Absolutely not.

"Q. Now, then, Doctor, I will ask you if, in your opinion, the fact that Mrs. Burgess responded to treatment at the x-ray clinic and improved, as you have heard Dr. Young and Dr. Martin testify, would that or not be conclusive evidence that the strain had been dissipated, or the effect of the strain had been dissipated? A. Oh, yes."

It is well established law that the burden is upon the claimant to show that the injury complained of, either caused the deceased's death or accelerated a pre-existing condition which resulted in bringing about or hastening the death of the deceased.

Where medical testimony is relied upon to show a causal connection between an accidental injury and a certain result, testimony by medical experts that the ailment in question "possibly" or "might have" resulted from the accident or that "the one could have brought about the other" is not sufficient in order to justify an award. It is necessary that such testimony go further, at least to the extent that, in their professional opinion, the result in question "most probably came from the cause alleged." *Branch v. Pacific Mills,* 205 S. C. 353, 32 S. E. (2d) 1, 5; *Mack v. Branch No. 12 Post Exchange,* 207 S. C. 258, 35 S. E. (2d) 838; *Ashley v. South Carolina Highway Department,* 213 S. C. 354, 49 S. E. (2d) 505.

Here respondents produced two witnesses: The first, Mr. J. C. Burgess, testified that he was the widower, that compensation had been paid during her lifetime until the date of her death, that she was totally disabled during this time. The second witness, Dr. A. R. Guyton, testified that he saw the deceased for the first time December 17, 1945, that he was not attending her at the time of her death, but that he knows of his own knowledge that she is dead.

As will be readily seen, there is no testimony to the effect that the deceased's death was caused or accelerated by an injury which arose out of and in the course of her employment. On the contrary, there is some testimony to the effect that she was benefited to the extent that her life was extended by the prompt treatment and operation which was accorded her after her reporting to the doctors. An award must be based on somthing more than surmise or conjecture. *Rudd v. Fairforest Finishing Co. et al.,* 189 S. C. 188, 200 S. E. 727; *Jeffers v. Manetta Mills*

*et al.,* 190 S. C. 435, 3 S. E. (2d) 489; *Radcliffe v. Southern Aviation School,* 209 S. C. 411, 40 S. E. (2d) 626.

If, under the evidence, there was doubt of causal connection or whether decedent's death was accelerated by accidental injury, the doubt should be resolved in favor of compensability, and the award allowed to stand. But where there is no evidence of substance to make issue with the unanimous medical opinion, referred to in the testimony above, to the ·fact that the decedent's death could not have been caused or accelerated by the accidental injury referred to, it becomes the duty of this Court to reverse the award. The lack of substantial conflict in the testimony renders the question of causal connection or acceleration of death, which is ordinarily one of fact for the Industrial Commission, a question of law to be determined by the Court. *Elrod v. Wellington Mills,* 214 S. C. 171, 51 S. E. (2d) 620.

Because of the nature of this case, we have quoted rather extensively from the testimony which, in our opinion, not only fails to show that the deceased's death was caused or accelerated by the injury complained of, but shows beyond all doubt that it was not.

We are therefore of the opinion that the award should be reversed and judgment entered for appellants, and it is so ordered.

BAKER, C. J., and FISHBURNE, STUKES, and OXNER, JJ, concur.