17358

LILLIE BRADY, Claimant-Respondent, v. SACONY OF ST. MATTHEWS, Employer, and AMERICAN MUTUAL LIABILITY INSURANCE COMPANY, Carrier, Defendants-Appellants.

(101 S. E. (2d) 50)

*Joseph L. Nettles, Esq.,* of Columbia, *for Appellants,*

*L. Marion Gressette, Esq.,* of St. Matthews, *for Respondent;*

December 3, 1957.

Moss, Justice.

This is a proceeding for compensation under the Workmen's Compensation Act, Section 72-1 *et seq.,* Code of 1952, instituted by Lillie Brady, respondent, against Sacony of St. Matthews, Inc., employer, and American Mutual Liability Insurance Co., carrier, appellants.

The respondent was employed by Sacony as a buttonhole marker and elastic cutter. On December 19, 1955, while seated at her work table, she began to feel hot and flushed and became ill. She went to the ladies' rest room. There, standing by an open window, she fainted and fell, striking her head against a brick sill protruding from the window, causing a slight abrasion on her face and a cut on her head. Thereafter, the respondent filed a claim against the appellants under the Workmen's Compensation Act for medical benefits and total disability claimed to be the result of her fall.

The hearing commissioner found that the respondent received an injury by accident arising out of and in the course of her employment. The appellants made timely application for a review before the full industrial commission. The order of the single commissioner was affirmed by the full commission. Thereafter, an appeal was duly taken by the employer and its insurance carrier to the Court of Common Pleas for

Calhoun County, South Carolina. This appeal was heard by the Honorable George T. Gregory, Jr., Presiding Judge, who, on January 3, 1957, issued his order affirming the decision and award of the commission.

Timely appeal to this Court followed. The single exception raises the question of whether there was any evidence to support the award of the commission. The appellants deny that the respondent suffered a fall and injury that arose by accident out of her employment or that there was a causal connection between the injury and her employment. They contend that the injury suffered by the respondent was due to an internal body failure. The respondent contends that the only reasonable inference to be drawn from the evidence is that she became overheated as a result of her employment, causing her to become sick and nauseated, and from which condition she fell and received her injury.

■ It should be borne in mind that the burden is upon the claimant to prove such facts as will render the injury compensable, within the provisions of the Workmen's Compensation Act, and such award must not be based upon surmise, conjecture or speculation. *Leonard v. Georgetown County,* 230 S. C. 388, 95 S. E. (2d) 777; *Broughton v. South Carolina Game & Fish Department,* 219 S. C. 50, 64 S. E. (2d) 152; *Mims v. Nehi Bottling Co.,* 218 S. C. 513, 63 S. E. (2d) 305.

■ We have likewise held that the Industrial Commission is the fact finding body, and this Court and the Circuit Court, both being Appellate Courts in Workmen's Compensation cases, can only review the facts to determine whether or not there is any competent evidence to support the finding of fact made by such Commission. *Leonard v. Georgetown County, supra; Wilson v. City of Darlington,* 229 S. C. 62, 91 S. E. (2d) 714; *Whitfield v. Daniel Construction Co.,* 226 S. C. 37, 83 S. E. (2d) 460; *Rudd v. Fairforest Finishing Co.,* 189 S. C. 188, 200 S. E. 727; *Jones v. Anderson Cotton Mills,* 205 S. C. 247, 31 S. E. (2d) 447. It follows that this Court, and also the Circuit

Court, may reverse an award if there is an absence of any evidence to support it.

Section 72-14 of the 1952 Code of Laws of South Carolina, defines injury and personal injury as follows:

" 'Injury' and 'personal injury' shall mean only injury by accident arising out of and in the course of the employment and shall not include a disease in any form, except when it results naturally and unavoidably from the accident and except such diseases as are compensable under the provisions of chapter 5 of this Title."

This Court has held that before a claimant can be awarded compensation under the Act for injuries suffered, it must be shown that such injuries arose out of the employment and in the course of employment. There is no question raised here that the injury suffered by the claimant was while in the course of her employment, but the question is whether or not the injury suffered arose out of her employment. When the Act speaks of arising out of the employment, it has reference to the origin and cause of the injury. *Radcliffe v. Southern Aviation School*, 209 S. C. 411, 40 S. E. (2d) 626.

Bearing in mind the foregoing principles we must now determine whether or not there was any competent evidence before the Commission tending to show that the injury to the claimant was the result of accidental means arising out of her employment.

The testimony shows that the respondent, at the time of her injury, was 41 years of age, in good health, and had been employed for six years by Sacony. During this period of time she had not missed a day from her work. She testified also that on December 19, 1955, the day of her injury, that she was engaged in cutting elastic to go in the legs of bathing suits. She was sitting at a table performing her duty. She had been at work for about four hours and had not been sick during this period. However, she began to feel hot, flushed, sick and nauseated. She retired from the workroom

to the rest room provided for the female employees. There she fell, sustaining a slight abrasion on her face and a cut on her head, described by the physician as being about three-quarters of an inch long and one-quarter of an inch deep. As is heretofore stated, it was the theory of the respondent that she became overheated as a result of her employment, causing her to become sick and nauseated, from which condition she fell and received her injury. We quote the testimony of the respondent with reference to this.

"Q. Well, what about the heat in the building? A. Well the building got awfully hot at times and this particular morning I don't remember whether it was hot, but I know I got awfully hot.

"Q. You got awfully hot? A. Just before I—

"Q. Will you describe your feelings, I mean what happened? A. Well, just maybe about eleven thirty I got to feeling kind of bad, kind of—you know kind of flushy feeling like and I sat there—

"Q. What was that due to? A. It could have been due to the heat, probably to the heat in the building."

She also testified on cross examination as follows:

"Q. Is that the situation? You just began to feel hot? A. Well, I began to feel hot and the room got so hot—I mean as a usual thing it was hotter than it should have been. I mean a lots of times it was.

"Q. You just felt stuffy? A. Yes, sir.

"Q. You say it's frequently that way? A. It's frequently that way, yes, sir.

"Q. Now, did anything unusual happen insofar as your work was concerned? A. No.

"Q. Were you doing any excessive lifting or anything like that? A. No.

"Q. Just began to feel faint and got up to go to the rest room? A. Yes."

And again from the testimony of the respondent, we quote:

"Q. And then suddenly the faintness just overcame you? A. That's right.

"Q. Did this come on you. all at once, Mrs. Brady, or had you noticed all morning that you were getting hot? A. No, sir, it came on kind of all of a sudden.

"Q. All of a sudden feeling? A. That's right.

"Q. Do you have any idea of how long it took to come on? A. No, sir, I don't. I believe I started feeling bad about ten minutes before I went in the rest room."

Immediately following the fall of the respondent, Dr. F. R. Huff, a practicing physician in St. Matthews, South Carolina, was called to the Sacony plant to attend the respondent. He testified with reference to the heat of the room, "Nothing impressed me particularly about it." He further testified that after the injury to the respondent she complained of a tightness and heaviness in her chest, and she wasn't complaining particularly about her head, that she was nervous and upset all the time. When asked "What would most probably cause this trouble that she's had?" he answered, "I don't think anybody—I don't think a doctor is going to be able to answer that question. I would say that it could, and then again it might not have. As to the possibility I don't know how to answer it." He was also asked the following question— "Q. Well, does it stand to reason from a medical standpoint that if a person received a severe cut on the head that that would most probably cause the result of which she was complaining?" He answered: "Well, I think the cut certainly couldn't have caused this condition. Now, if she had hit her head hard enough, which she possibly might have done, to cause a concussion, this might have been the result of a concussion or it might have been the results of a small stroke with a personality change following it or—I mean a stroke or an injury, but there's no way in the world that any doctor can say that. I think that will have to be left up to the lawyers."

He was also asked:

"Q. And you've treated her. Now, what is your professional opinion? If the fall didn't cause it, what caused it?

A. Well, I don't think anybody's ever arrived at a conclusion as to what did cause it. However, the possibilities are these as I see it and as Dr. Wells sees it. I think we both agree on this. The possibility that she had a concussion from the fall which could have caused her excessive nervousness since that time; the possibility that she is going through the change of life and is just—whether the fall has connection with it, no way of telling, any of these things; and the other possibility would be of what they call a small stroke without any paralysis but with a personality change."

Then again this physician testified:

"Q. Well, did you suspect that her symptoms or her complaint might be referable to menopause? A. I suspected it.

"Q. Do you still think it's a good possibility? A. I think there are those three possibilities that I have already mentioned. There are three possibilities and I don't know which one it is.

"Q. That is the possibility of a slight stroke or menopause and what was the third one? A. The third was the concussion following the fall.

"Q. I see, and you aren't able to pick out any one of those as being more likely than either of the other two? A. I'm afraid not.

"Q. Doctor, is a feeling of stuffiness a usual concomitant of faintness? A. Of what, faintness?

"Q. Of fainting? A. Fainting?

"Q. Yes. A. That is, yes.

"Q. And what—can you give any cause for fainting ordinarily? A. Well, some people are just more prone to faint than others in the first place. Standing or sitting quietly in one place the blood tends to pool in the lower extremities and cause a lack of blood in the brain, and that aggravates or tends to cause fainting. It's—"

And again from the physician's testimony:

"Q. Now, doctor, with regards to her fall, isn't it just as likely that her general condition caused her to faint and fall

that day as it is that her fall caused her condition now? A. Yes, I would say it's just as likely one way or the other.

"Q. Now, in her talking to you did she make any complaint about anything unusual happening in the course of her work? A. No.

"Q. To point up or cause this fall? A. No.

"Q. I take it then that the only way you were able to reach any conclusion as to what caused her to fall is largely on the basis of just guessing what might have caused anybody else to fall? A. That's right. ·

"Q. And she could just as well have had the fall in the middle of the street or anywhere else? A. Well—

"Q. I mean there wasn't anything in relation to the work that she did? A. Nothing that I know of."

The physician also testified, in answer to what were the possible causes of the respondent's fall, said:

"Well, of the three things that I mentioned were the possible causes of her trouble, certainly I mean she didn't have the concussion before she fell. She might have just fainted and had a concussion. She might have had a faint from a change of life. She might have had a small stroke and passed out, fainted from a small stroke. I mean those are the possibilities, but now just what caused that I don't think we know."

The respondent also testified that there were windows in the room that could have been opened but she did not recall whether or not she asked anyone to open a window. Three of her fellow employees testified that there was nothing unusual about the heat in the building that morning and that it was not an excessively hot place in which to work. ·

An analysis of the testimony of the respondent shows that she did not remember whether the building was particularly hot on the morning of her fall. She used such expressions as her fall "could have been due to the heat, probably to the heat in the building." She also said "I mean as a usual thing it was hotter than it should have been, I mean a lot of times it

was." She also testified that she started feeling bad about ten minutes before she went to the rest room. To conclude that the testimony of the respondent shows that her fall was due to the overheated condition of the room in which she was working would be to engage in surmise, conjecture and speculation. Taking the evidence as a whole, there is an absence of any testimony upon which to base the conclusion reached by the Industrial Commission. Undoubtedly excessive heat is one of a number of things that causes a person to faint, but it would be surmise, and conjecture to hold that the evidence in this case shows the respondent received her fall because of being overheated. There is no testimony that following her injury she was treated for a heat stroke.

We come now to a consideration of the testimony as given by the physician. This Court has set forth the rule by which an expert's testimony must be judged in showing the connection between the injury and the alleged cause thereof. In the case of *Branch v. Pacific Mills,* 205 S. C. 353, 32 S. E. (2d) 1, 5, this Court said:

"We quote with approval from the case of *Fink v. Sheldon Axle & Spring Co.,* 270 Pa. 476, 113 A. 666, 667, a case involving the Pennsylvania Workmen's Compensation Act, 77 P. S., § 1 *et seq.,* wherein the Court said: 'It must be understood, however, that when, in cases of this class, expert testimony is relied on to show the connection between an alleged cause and a certain result, it is not enough for the doctors to say simply that the ailment in question might have resulted from the assigned cause, or that the one could have brought about the other; they must go further and testify at least that, taking into consideration all the attending data, it is their professional opinion the result in question most probably came from. the cause alleged.' "

We have heretofore quoted portions of the medical testimony and from it it clearly appears that it does not measure up to the requirements laid down by this Court, in order that the testimony may have some probative value. To base an award upon the testimony of the physician in this case

would be to again engage in surmise, conjecture and speculation.

The respondent takes the position that the evidence in this case brings it within the scope and principles established in the case of *Smith v. Southern Builders*, 202 S. C. 88, 24 S. E. (2d) 109. We do not think so. In the *Smith case* there was an unqualified opinion that the death of the employee was caused by a heat stroke. Upon this testimony the Industrial Commission found as a fact that the deceased suffered from a heat stroke which arose out of and in the course of his employment, and subsequently resulted in death. This holding was reversed by the Circuit Court but was reinstated upon appeal to this Court. In the instant case, there is no testimony of the physician that the injury to the respondent was caused by excessive heat in the place where she worked. He frankly testified that he did not know what caused the injury to the respondent.

We conclude in this case that the testimony is such that a reasonable inference cannot be drawn that there was any causal connection between the work of the employee and her injury.

The judgment appealed from is reversed, and the case remanded to the Circuit Court for entry of judgment in favor of appellants.

STUKES, C. J., and TAYLOR, OXNER and LEGGE, JJ., concur.